*Timothy Ingram, et al. v. Cantwell-Cleary Co., Inc.*
No. 421, Sept. Term 2022
Opinion by Leahy, J.

**Antitrust and Trade Regulation > Trade Secrets and Proprietary Information > In General > Statutory provisions**

Because the Maryland Uniform Trade Secrets Act, (or "MUTSA"), codified at Maryland Code (1975, 2013 Repl. Vol.), Commercial Law Article ("CL"), Sections 11-1201–1209, explicitly directs that a breach of contract claim—regardless of whether said claim is "based upon misappropriation of a trade secret"—may be brought alongside a statutory claim for misappropriation of trade secrets, it is clear that the existence of an agreement that imposes liquidated damages for a breach of a confidentiality clause or other conduct that is similar to the misappropriation of trade secrets does not necessarily foreclose the availability of monetary relief under MUTSA. CL § 11-1207(b)(1)(i).

**Antitrust and Trade Regulation > Trade Secrets and Proprietary Information > In General > Customer lists, vendor, and pricing information**

Based on the evidence presented, the trial court did not err in determining the plaintiff's confidential customer lists, vendor pricing, profit margins, and other pricing information constituted trade secrets under MUTSA, CL § 11-1201(e)(1), because that information derived independent economic value after having been developed by the plaintiff over time, and because it was not generally known to competitors in a highly competitive industry.

**Antitrust and Trade Regulation > Trade Secrets and Proprietary Information > In General > Vigilance in protecting secret**

Trial court did not err in finding the plaintiff took reasonable steps under the circumstances to maintain the secrecy of its trade secrets, including internal customer and pricing information, as required by MUTSA, CL § 11-1201(e)(2), where the plaintiff restricted access to the information on a company database; an employee handbook prohibited employees from removing sensitive categories of information, which encompassed the trade secrets; and employees were required to sign a Non-Compete agreement under which they acknowledged a duty to keep the information confidential.

**Antitrust and Trade Regulation > Trade Secrets and Proprietary Information > Derived From or Through Another Person**

The evidence was sufficient to support a finding that Appellants misappropriated trade secrets that were "derived from or through" another person in violation of CL § 11-1201(c)(2)(ii)(1) and (3). In other words, the evidence showed that Appellants used Cantwell-Cleary's trade secrets and that they "knew or had reason to know" that another person, such as Vince Jr. or Ms. McCannon, either "utilized improper means to acquire"

the trade secrets they used, or "owed a duty to the person seeking relief to maintain its secrecy[.]"  CL § 11-1201(c)(2)(ii)(1) and (3).

**Antitrust and Trade Regulation > Trade Secrets and Proprietary Information > Actions > Relief > Damages**

The durational period for measuring damages under MUTSA, CL § 11-1203, is limited to "the period of time that the information would have remained unavailable to the defendant in the absence of the appropriation[,]" as measured by "the time it would have taken the defendant to obtain the information by proper means such as reverse engineering or independent development."  RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 45 cmt. h (AM. L. INST. 1995).

**Antitrust and Trade Regulation > Trade Secrets and Proprietary Information > Actions > Defenses in general**

The unauthorized use of a trade secret by a former employee who has committed it to memory can amount to the misappropriation of a trade secret.  *See Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115, 140 (D. Md. 2020).

**Antitrust and Trade Regulation > Trade Secrets and Proprietary Information > Actions > Relief > Damages**

Plaintiff's expert, in calculating the actual loss caused by the misappropriation under MUTSA, CL § 11-1203(b)(1), swept in lost sales to former customers who did not follow defendants to the new packaging business without proving those losses were *caused* by the misappropriation, thereby veering astray of the fundamental principle that any claimed loss must be "attributable to the appropriation of the trade secret."  RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 45 cmt. b (AM. L. INST. 1995).

**Antitrust and Trade Regulation > Trade Secrets and Proprietary Information > Actions > Costs and attorney fees**

Under the plain terms of MUTSA, CL § 11-1204, although a trial court is ultimately imbued with discretion to fashion or not fashion a fee award, the court *must* make a factual finding of willful and malicious misappropriation as a predicate to exercising that discretion.

Circuit Court for Anne Arundel County
Case No. C-02-CV-18-002875

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 421

September Term, 2022

_____

TIMOTHY INGRAM, ET AL.

v.

CANTWELL-CLEARY CO., INC.

_____

Leahy,
Reed,
Battaglia, Lynne A.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Leahy, J.

_____

Filed: December 22, 2023

A group of key employees of Cantwell-Cleary Co., Inc. ("Cantwell-Cleary" or "Appellee") abandoned their jobs one July afternoon in 2018 to take positions with Cleary Packaging, LLC, a rival company formed weeks earlier by Cantwell-Cleary's erstwhile President, Vince Cleary Jr. ("Vince Jr.").[1]  Leading the way was Kevin Barstow, who, together with Timothy Ingram ("Appellants"), brought many of their former clients with them to Cleary Packaging and sold those clients the same shipping and packaging products that they had purchased in the past from Cantwell-Cleary.  Suddenly, Cantwell-Cleary experienced a sharp decline in revenue.

Cantwell-Cleary brought two lawsuits in the Circuit Court for Anne Arundel County, Maryland.  The first, against Mr. Barstow, asserted claims for breach of contract and injunctive relief for violating the company's standard "Duty of Confidentiality and Covenant Not to Compete" agreement ("Non-Compete" or "Agreement"), along with a claim for misappropriation of trade secrets in violation of the Maryland Uniform Trade Secrets Act, (or "MUTSA"), codified at Maryland Code (1975, 2013 Repl. Vol.), Commercial Law Article ("CL"), sections 11-1201 to 1209.  Similarly, the second lawsuit, against Mr. Ingram and Dennis Ibbott[2] (another former Cantwell-Cleary salesperson), included claims for breach of contract and injunctive relief against each for violating the Non-Compete and for misappropriation of trade secrets in violations of MUTSA.  The First

---

[1] We refer to the members of the Cleary family by their first names for clarity and we mean no disrespect thereby.

[2] Mr. Ibbott is not a party to this appeal.

Amended Complaint against Ingram and Ibbott included claims for conspiracy and breach of their duties of loyalty. The two actions were consolidated for trial.

Following an eight-day bench trial, the court delivered an oral ruling on September 2, 2021. The court found Mr. Barstow liable for breach of contract and misappropriation of trade secrets in violation of MUTSA. The judge also found Mr. Ingram and Mr. Ibbott liable on all counts, including breach of duty of loyalty and civil conspiracy. On September 24, 2021, the court entered a corresponding written judgment setting forth its findings as to liability and ordering Mr. Barstow, Mr. Ingram, and Mr. Ibbott to pay damages in the amount of $780,757.32, $867,335.44, and $273,004.72, respectively, for the misappropriation of Cantwell-Cleary's trade secrets. The court also entered injunction orders against the three former employees which required, among other things, that they return to Cantwell-Cleary any records relating to the company's business operations, and prohibited them from competing with Cantwell-Cleary in the sale of packaging products within a 75-mile radius of the company's primary facility for a period of one year from the date of the order.[3]

On February 14, 2022, after a tangled series of post-judgment motions relating to a collateral bankruptcy proceeding and stay, the circuit court struck the September 24, 2021, judgment and re-entered the judgment and injunctions in the same form and based upon the same findings of liability. The court specified, however, that the clerk "shall enter the monetary judgments on the docket against the [Appellants], but shall not issue Notices of

_____

[3] Appellants do not challenge the injunction orders in this appeal.

2

Judgment as to the monetary judgment without further order of the United States Bankruptcy Court[.]" In a separate order entered on the same date, the court denied Cantwell-Cleary's petition for attorneys' fees after finding no malice by Appellants. Cantwell-Cleary filed a motion requesting clarification of the court's order denying attorneys' fees, and Appellants filed a motion to alter or amend the February 14 Judgment.

On April 13, 2022, the court denied Appellants' motion to alter or amend the February 14 Judgment and entered a separate order clarifying its ruling on attorneys' fees and stating that, although Appellants had engaged in malicious conduct that caused a deliberate and intentional injury to Cantwell-Cleary in violation of MUTSA, that malicious conduct did not apply to Cantwell-Cleary's request for attorneys' fees.

Appellants noted a timely appeal and present four questions for our review, which we have re-ordered and re-cast as follows:

I.     Did the trial court err in not enforcing the liquidated damages provision of Appellants' Non-Compete Agreements with Cantwell-Cleary?

II.    Did the trial court err by concluding that customer lists and pricing information constituted trade secrets under the Maryland Uniform Trade Secrets Act?

III.   Was the trial court's award of damages for misappropriation of trade secrets based upon a speculative methodology for approximating Cantwell-Cleary's lost profits?

IV.    Did the trial judge abuse his discretion in clarifying his factual findings in support of his ruling denying Cantwell-Cleary's motion for attorneys' fees?

We hold that the court did not err in declining to enforce the liquidated damages provisions contained in Appellants' Non-Compete Agreements because they did not bar Cantwell-Cleary from recovering damages under its separate claims for misappropriation

3

of trade secrets under MUTSA.  We also hold that the court did not err in finding that Cantwell-Cleary's confidential customer lists and pricing information constituted trade secrets and that Appellants had misappropriated that information.  Regarding the third issue, however, we conclude that the court erred in relying on Cantwell-Cleary's expert's damages calculations because, among other things, those calculations impermissibly included lost sales that were not proven to have flowed from the acts of misappropriation. Finally, we hold that the court abused its discretion in deciding, without explanation, that Appellants engaged in conduct that amounted to malice in regard to their misappropriation of trade secrets, but not for purposes of awarding attorneys' fees under MUTSA.

In line with these holdings, we vacate the February 14 Judgment as it pertains to damages and the April 13 Order clarifying attorneys' fees.  Proceedings on remand shall be limited to: (1) re-calculating Cantwell-Cleary's damages for lost profits, and (2) specifying the grounds for any finding of malice against Appellants.  In all other respects, we affirm the judgments of the trial court.

## BACKGROUND

Because of the segmented nature of the issues presented, we present a brief background to provide context for our discussion.  The following account draws from the evidence presented at the bench trial that began on August 23 and concluded on September 2, 2021.  More details relevant to the issues on appeal are included in the discussion.

### The Family Business

Since the 1960s, Cantwell-Cleary has operated as a family business based in Howard County, Maryland.  The company sells packaging materials, paper products,

4

janitorial and sanitation supplies, and office supplies. Among other services, the company provides clients with custom-made packaging for their products that is designed and manufactured by third-party vendors to protect the products in transit. Cantwell-Cleary is owned by Shirley Cleary, the matriarch of the Cleary family who ran the business alongside her late husband, Vincent Cleary Sr. All of the Cleary children—Vince Jr., Mary-Anne, Billy, Therese, Shirley, and Kathleen—have been involved in running the family business at various times.

After Vincent Cleary Sr. passed away, Vince Jr. took control of the day-to-day operations of the company. Vince Jr.'s relationship with his mother then began to fray. Specifically, Shirley claimed that Vince Jr. prevented her from coming into the office and inspecting the company's records, and that he threatened to "fine" her $10,000 for interfering with operations. In May 2018, at Shirley's direction, outside counsel drafted and sent a term sheet to Vince Jr. in an effort to settle the company's succession plan and ease tensions. Vince Jr. refused to respond, and Shirley terminated his employment in June 2018 after she purportedly heard that he was preparing to start a competing business. As Shirley foresaw, on June 22, 2018, Vince Jr. incorporated Cleary Packaging, LLC, as a competing operation and then entered into a commercial lease on July 13, 2018.

### Non-Compete Agreements

Bruce Canham, a longtime employee at Cantwell-Cleary, testified that the company had used the same standard Non-Compete agreement with new sales employees throughout his tenure. The Non-Compete contained very specific covenants and instructions, pursuant to which employees agreed, among other things: 1) not to compete with Cantwell-Cleary,

5

as an employee or in any other capacity, in the business of selling packaging, paper, and related products within a 75-mile radius of any office of Cantwell-Cleary for one year following termination of employment for any reason; and 2) to keep confidential information that was important to the company's ability to compete, including all customer lists, prices charged for products, names of vendors and suppliers, and the contents of marketing, sales, and other business plans. Under the terms of the standard Non-Compete, which was admitted into evidence at trial, employees agreed to pay Cantwell-Cleary $50,000 "as and for liquidated damages, and not as a penalty," in the event they breached their duty of confidentiality or any covenants not to compete. The stated consideration for employees who signed the Non-Compete was "compensated services as a Cantwell-Cleary employee" and a $50 check. Therese Cleary testified that records showed the company issued $50 checks to Appellants. Moreover, Therese disclosed that she conducted an audit of Cantwell-Cleary's files containing signed Non-Compete agreements at the behest of Vince Jr., and that those files revealed that Appellants had each executed a Non-Compete when they joined the company. At trial, Appellants maintained that they did not recall signing any Non-Compete agreement.

### July 2018 Mass Exodus

Appellants, both salespersons for Cantwell-Cleary, left the company in July 2018 to work for Cleary Packaging. At trial, Cantwell-Cleary produced voluminous testimony and corroborating documents verifying that Appellants resigned as part of a coordinated effort to join Vince Jr.'s fledgling operation. In particular, cell phone records admitted at trial indicated that Appellants engaged in extensive conversations with Vince Jr. during the days

6

surrounding their resignations from Cantwell-Cleary. Much of the testimony at trial also concerned the disappearance of the physical and digital copies of the Non-Compete agreements between the company and several of its key employees, including Appellants.

In the days following Vince Jr.'s termination, he met with several Cantwell-Cleary employees at a local hotel. He also engaged in approximately 213 telephone calls with various Cantwell-Cleary employees between the date of his termination and July 16, 2018. Notably, Vince Jr. participated in 105 telephone calls totaling 34.18 hours with Appellant Barstow during this timeframe.

A group of employees, led by Mr. Barstow, presented the company with a demand letter "requiring, per their rights, copies of any and all" Non-Compete agreements between themselves and Cantwell-Cleary. The employees stated "[i]f no copies are supplied to the below individuals by 11:00 am Thursday, July 5th 2018[,] then those individuals will understand there are no such contracts of any kind[.]" In response to the demand letter, Therese and Kathleen Cleary discovered that the Non-Compete agreements for the undersigned employees were missing from the company's files. Therese looked for the documents in the company's cloud system, where she recalled placing scanned copies, and discovered that "all of [the Non-Compete agreements] were gone except" for that of a single salesperson, who remained with the company. A different salesperson reported that, around this time, Appellants told employees that "if they don't have the non-competes to show, they can't prove that you signed them." A third salesperson related that Mr. Barstow told him that the Agreements had "been taken care of[.]"

Events reached an inflection point at approximately 3:00 p.m. on July 16, 2018,

7

when a cadre of Cantwell-Cleary's top employees resigned and walked out of the facility. Records showed that Mr. Ingram had several short telephone calls with Vince Jr. during the walkout, followed by a 7-minute call at 3:26 p.m., and more extensive calls during the evening. In the days leading up to this mass exodus, several of the participating employees, including Mary McCannon—the company's executive administrator—and Kevin DeGregory—the company's top salesperson—went on vacation. Therese noticed that nearly all of Ms. McCannon's files containing proprietary customer, vendor, and pricing information had been removed from her office.

Ms. McCannon, Mr. Barstow, and other key employees started working at Cleary Packaging the day after they walked out of Cantwell-Cleary. Appellant Ingram stayed on with the company until July 30, and then joined Cleary Packaging the next day, taking his list of open orders detailing Cantwell-Cleary's pricing information, costs, and profits.

At Cleary Packaging, Appellants began selling the same packaging products to many of their former customers. According to William Cleary, the effect of this competition, along with the departure of other salespersons, was disastrous. He explained that Cantwell-Cleary's gross sales declined nearly 40% in the months immediately following the July 16 mass exodus. Ultimately, that decline persisted, and the company's total gross sales slumped from $26.5 million in 2017 to $14.6 million in 2020.

**The Lawsuits**

Cantwell-Cleary initiated a lawsuit against Mr. Barstow on July 25, 2018, and a separate lawsuit against Mr. Ingram and Mr. Ibbott on September 19, 2018. The operating Second Amended Complaint against Mr. Barstow stated a claim for breach of contract

8

under Count I, alleging Mr. Barstow breached the Non-Compete by accepting a sales position with a competing business within seven miles from Cantwell-Cleary's business office and then directly soliciting the customers of Cantwell-Cleary. Count II for preliminary and permanent injunction requested that Mr. Barstow be enjoined from competing with Cantwell-Cleary for a period of one year from the date of judgment, and that he be ordered to return Cantwell-Cleary's proprietary information. Count III for misappropriation of trade secrets alleged that Mr. Barstow misappropriated proprietary information as defined under MUTSA Section 11-1201(c), and then "disclosed and/or transferred the Proprietary Information to Cleary Packaging[.]" The complaint further stated that Mr. Barstow's misappropriation of the proprietary information, in conjunction with the conduct of Vince Jr., and other former employees of Cantwell-Cleary, "constitutes a critical component of a conspiracy whereby [Appellant Barstow] and these persons have sought to destroy the business of Cantwell-Cleary through wrongful means" thereby entitling Cantwell-Cleary to reasonable attorneys' fees under MUTSA Section 11-1203(d).[4]

The operating First Amended Complaint against Mr. Ibbott and Mr. Ingram stated separate claims for breach of contract under Counts I and II, respectively, alleging that they breached the Non-Compete. More specifically, these counts alleged that Ibbott and Ingram breached the Non-Compete by taking positions with Cleary Packaging less than seven miles from Cantwell-Cleary's business office, directly soliciting Cantwell-Cleary's

---

[4] Cantwell-Cleary later filed a motion for leave to amend its complaint against Mr. Barstow, again, to add a claim of civil conspiracy. That motion was denied as untimely.

9

customers, and soliciting other Cantwell-Cleary employees to resign and take new jobs with Cleary Packaging. Counts III and IV stated claims for misappropriation of trade secrets against Ibbott and Ingram, respectively; the allegations contained therein generally mirrored the allegations made in Count III of the Second Amended Complaint against Mr. Barstow. Counts V and VI for breach of duty of loyalty alleged that Ibbott and Ingram breached their fiduciary duty of loyalty to Cantwell-Cleary by organizing the mass exodus and by participating in a civil conspiracy. In turn, Count VII for civil conspiracy generally alleged that both Ibbott and Ingram, together with Vince Jr. and others, agreed to wrongfully use proprietary information taken from Cantwell-Cleary to start a competing business and, in so doing, "destroy the business operations" of Cantwell-Cleary. The First Amended Complaint further stated that, in addition to their use of Cantwell-Cleary's propriety information, Ibbott and Ingram furthered the conspiracy by breaching their Non-Compete agreements and inducing other Cantwell-Cleary employees to do the same. Counts VIII and IX for preliminary and permanent injunction requested that the court enjoin Ibbott and Ingram from competing with Cantwell-Cleary for a period of one year from the date of judgment, that they be ordered to return Cantwell-Cleary's proprietary information, and that the court award Cantwell-Cleary attorneys' fees under CL § 11-1204.

### Trial Court's Ruling

The trial court's comprehensive ruling from the bench spans nearly 40 pages of transcript. In summarizing the evidence presented, the judge emphasized that he "looked closely at witness behavior on the stand and their way of testifying." Based largely on the

testimony of Therese Cleary, the judge concluded that Appellants had signed the Non-Compete agreements:

> The court considered the testimony of Therese Cleary. The court does find her credible and does find that she saw the non-competes in question, that she scanned them with Cindy Wood into the Cloud pursuant to an order from Vince, Jr. That the non-competes exist and that they're now gone.

The judge noted that he did not find defense witnesses credible on this point—he did not believe Ms. McCannon's and Ms. Wood's testimony that they never saw or scanned the Non-Competes into Cantwell-Cleary's cloud system. Regarding Ms. McCannon, the court declared:

> I am convinced she made copies and I am convinced that she destroyed them. And I am convinced that she scanned them into the Cloud and I am convinced that she got rid of them. And it was just so convenient she planned her vacation a week prior.

The judge did not credit Appellants' testimony that they didn't "know that [their] non-competes exist[,]" and found that they had, in fact, assured other employees that the Non-Compete agreements could not be proven or produced. Thus, on the breach of contract claims, the court determined that:

> Kevin Barstow[,] his employment jacket was checked off, [Exhibit] 34[,] he got a $50 check. [Exhibit] 35 or 37[,] he got a $50 ADI printout. [Exhibit] 50, he's on a non-compete checklist . . . Timothy Ingram, non-compete memo, got a $50 check from Bruce Canham and he's on a non-compete checklist.
>
> *          *          *
>
> The non-competes exist. There is no question about that. 100 percent convinced they exist.
>
> The court finds for the [Cantwell-Cleary] on Count I[,] breach of contract[,] because each [Appellant] violated the contract by engaging in the [sale] of paper and packaging products directly or indirectly and competing with Cantwell[-]Cleary.

11

As a result, the court will grant a one year injunction with a 75 mile radius per the non-competes. The court finds that for a company that goes from Landover to Richmond and up to Pennsylvania there is absolutely nothing improper about a non-compete agreement which has that territory. It is clearly tied into the employee's duties. The time period of one year is not unreasonably long. I had Kevin DeGregory tell me making half a million dollars a year, he decided to comply with it.

The geographic area has a reasonable relationship to the geographic area which the employee worked. The business activity has a reasonable relationship to the duties. And there's nothing to indicate the employee was coerced or compelled to enter into the agreement.

Next, the court was persuaded by the testimony of William Cleary and former customers in deciding that Appellants had misappropriated trade secrets. The court stressed that it found "that these matters of pricing"—*i.e.*, Cantwell-Cleary's account-specific customer and pricing information built up over many years—"indicate trade secrets . . . [i]f I know the margins I can make money." Appellants used Cantwell-Cleary's pricing data to their advantage, the court found, based on the testimony of customers who followed them to Cleary Packaging. The court explained that they were charged "the same prices . . . . Why is that important? Because you couldn't get that account if you didn't know what the prices were." The court expounded on Appellants' misappropriation of Cantwell-Cleary's confidential customer and pricing information:

> And the customer list, the vendor pricing, the profit margins, the pricing to customers, the receivables, the good will of the salesmen these were all used [sic] and the court finds them to be trade secrets. And they were all used to cause unjust enrichment and actual loss by their misappropriation.

> Go back to what [a former and current customer of Mr. Ingram] told us on July 30th. When Mr. Ingram called, yep, he sold me exactly pretty much what I had before. If I know what to price it for, and I know how to cut my competitor, I can make a whole lot of money, because we're talking pennies

12

on the dollar here. And when we're talking thousands and thousands of items, it all adds up. That's been proven.

Turning to address the civil conspiracy claim against Mr. Ibbott and Appellant Ingram, the judge acknowledged that he must consider whether "there was an agreement between at least two persons to accomplish an unlawful act or use unlawful means to accomplish an act not in itself illegal." The judge resolved that there were "a whole lot more than two people that were involved" in the conspiracy, including Ibbott and Ingram. The evidence "convinced" the court that Vince Cleary was determined "to destroy Cantwell[-]Cleary and all civil conspirators are jointly and severally liable for the harm caused . . . by the conspiracy[.]"

The court then proceeded to award money damages for the Appellants' misappropriation of trade secrets, relying on the calculations provided by Cantwell-Cleary's expert, Jeffrey Coleman. Despite expressing some reservations regarding Mr. Coleman's approach, the court awarded damages based on Mr. Coleman's calculations up to the date of judgment:

> Now, here's where I'm, I'll be candid, uncomfortable. I have to assess damages. And actual loss is a damage for violation of the Trade Secrets Act, as well as attorney fees, which I am reserving on. And the actual loss that I have, based upon the testimony from the plaintiff's witness, Mr. Coleman, is that Kevin Barstow caused $780,757.32 in los[t] profit for the breach of the trade secrets [of] Cantwell[-]Cleary.
>
> . . . . Timothy Ingram caused $867,335.44. As I said, I would've liked to have known overhead and net profit, but those are [the] gross profits that were presented to me, and there was no evidence to dispute that.
>
> Based on the evidence that I have, I will assess damages against Mr. Barstow for $780,757.32, which is the actual loss from August 1st, 2018 to September 2nd, 2021. . . . And Mr. Ingram in the amount of $867,335.44.

13

On September 24, 2021, the court entered a corresponding written order granting Cantwell-Cleary injunctive relief and damages against Appellants and Mr. Ibbott. The judgment order specified that Mr. Barstow was found liable for breach of contract and misappropriation of trade secrets and awarded damages against him in the amount of $780,757.32. The judgment order also found Mr. Ingram liable for breach of contract, misappropriation of trade secrets, breach of fiduciary duty, and civil conspiracy, and imposed damages against him in the amount of $867,335.44. Attached as exhibits to the judgment were separate orders enjoining Appellants from competing with Cantwell-Cleary in the sale of paper and packaging products within a 75-mile radius, soliciting Cantwell-Cleary's customers, or obtaining any ownership interest in a competing business for one year from the date of the order (*i.e.*, from September 24, 2021, to September 24, 2022).

### Post-Judgment Motions and Appeal

On September 15, 2021—after the court delivered its oral ruling but prior to entry of the court's written order—Appellants each filed a "Suggestion of Stay" advising the circuit court that they had filed for bankruptcy in the United States Bankruptcy Court for the District of Maryland (the "Bankruptcy Court") and that "pursuant to 11 U.S.C. § 362(a), the commencement or continuation of any actions against [Appellants] is stayed."[5]

---

[5] Under the United States Bankruptcy Code, 11 U.S.C. § 362(a) ensures that potentially conflicting litigation is stayed pending the resolution of bankruptcy proceedings. The statute provides, in relevant part that:

> (a) Except as provided in subsection (b) of this section a petition filed under section 301, 302, or 303 of this title, or an application filed under section

[Footnote continued]

Consequently, Appellants moved to "strike and nullify" the September 24, 2021 judgment as entered in violation of the automatic stay of proceedings following the initiation of bankruptcy proceedings. The circuit court stayed the case by written order entered October 1, 2021, "until the Court receives further instructions from the Bankruptcy Court."

On November 1, 2021, the Bankruptcy Court entered separate orders in Appellants' respective bankruptcy cases modifying the automatic stay to permit the circuit court to (1) vacate the judgment and injunctions entered on September 24, 2021, and (2) enter a new judgment and injunctions "in the same form and substance" but to refrain from entering any notice of recordation of money judgment.

The circuit court held a hearing on February 9, 2022, to address the outstanding motions and untangle the procedural morass that had developed since its oral ruling on September 2, 2021. Several days later, on February 14, 2022, the court entered a new judgment, after striking the previous judgment and injunction orders as "void" and in violation of the bankruptcy stay, and, based upon the same findings of liability, ordered

---

5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of—

> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;
> (2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title[.]

11 U.S.C. § 362(a).

Appellants to pay the damages previously ordered. The clerk of the circuit court was instructed to enter the monetary judgments on the docket but not to issue notices of judgment as to the monetary judgments without further order of the Bankruptcy Court. The injunction orders specified that the new one-year injunctions against each Appellant were set to run from the date of the entry of the orders—that is, until February 14, 2023. On that same day, the court entered a written order denying Cantwell-Cleary's motion for attorneys' fees.

Appellants filed a timely motion for new trial or to alter or amend the February 14 Judgment under Maryland Rules 2-533 and 2-534. Cantwell-Cleary, in turn, filed its own motion to alter or amend, under Maryland Rules 2-534 and 2-535, requesting that the court clarify its factual findings supporting the denial of Cantwell-Cleary's motion for attorneys' fees.[6] On April 13, 2022, the court entered two orders: one denying Appellants' motion for a new trial or to alter or amend; and the second granting Cantwell-Cleary's motion to clarify. In the second order, the judge stated that, although Appellants had engaged in "willful and malicious conduct" that caused a deliberate and intentional injury to Cantwell-Cleary in violation of MUTSA, that malicious conduct did not apply to Cantwell-Cleary's

---

[6] Cantwell-Cleary's motion was filed on February 25, 2022, eleven days following the court's February 14 Attorneys' Fees Order. Because the motion was filed eleven days after the February 14 Attorneys' Fees Order, it is treated as a motion to revise the judgment under Maryland Rule 2-535(a), which provides that "On motion of any party filed within 30 days after entry of judgment, the court may exercise revisory power and control over the judgment and, if the action was tried before the court, may take any action that it could have taken under Rule 2-534." Md. Rule 2-535(a). Thus, although not a timely Rule 2-534 motion (which would have had to have been filed within ten days of the February 14 order), Cantwell-Cleary's motion was timely under Rule 2-535(a).

16

request for attorneys' fees.  Appellants noted a timely appeal on May 5, 2022.

## DISCUSSION

## I.

## STANDARD OF REVIEW

In *Braude v. Robb*, 255 Md. App. 383 (2022), we recently explained the standard of review applicable to a circuit court's decision in a case tried to the court:

> When reviewing a bench trial decision, we will not set aside a trial court's judgment on the evidence unless it is clearly erroneous, giving "due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. Rule 8-131(c).  We view the evidence in the light most favorable to the party who prevailed at trial.  *Brault Graham, LLC v. Law Offices of Peter G. Angelos, P.C.*, 211 Md. App. 638, 660 (2013).  If a trial court does not make findings of fact, no presumption as to them arises merely from the decision. *Burroughs Int'l Co. v. Datronics Eng'rs, Inc.*, 254 Md. 327, 338 (1969).  In contrast to factual findings, we review a trial court's legal findings de novo. *MBC Realty, LLC v. Mayor & City Council of Baltimore*, 192 Md. App. 218, 233 (2010).

*Braude*, 255 Md. App. at 397-98.

The first issue, whether the trial court properly awarded damages under MUTSA instead of the parties' Non-Compete, is a legal question that we review without deference to the trial court.  *See Impac Mortg. Holdings, Inc. v. Timm*, 474 Md. 495, 533 (2021) ("The interpretation of a contract . . . is a question of law.") (citation omitted); *Minh-Vu Hoang v. Lowery*, 469 Md. 95, 104 (2020) ("The Court reviews issues of statutory interpretation de novo.") (citation omitted).

Next, we review both the trial court's factual determinations and application of the law in determining whether the court correctly found, based on a preponderance of the evidence, that Appellants misappropriated trade secrets in violation of MUTSA.  Initially,

the court must determine whether the information that was allegedly misappropriated qualifies as a trade secret as defined under CL § 11-1201(e), and then the court must decide whether the Appellants actually misappropriated the trade secret in violation of CL § 11-1201(c).

The third issue—whether the trial court erred by determining, without any explanation, that it was more appropriate to use past figures to measure the sales improperly diverted from Cantwell-Cleary than the actual sales figures for the period of misappropriation in the court's calculation of damages under CL § 11-1203(b)(1), and whether the court erred by sweeping in lost sales to former customers of Appellants that did not provide any business to Cleary Packaging—presents questions of law that we review without deference.

Finally, we must consider whether the trial court abused its discretion when, in its written order in response to Cantwell-Cleary's motion requesting clarification of the court's order denying attorneys' fees, the court determined that Appellants had engaged in malicious conduct without providing its reasoning for reversing its initial position on the record. *See, e.g.*, *Maddox v. Stone*, 174 Md. App. 489, 502 (2006).

## II.

### Liquidated Damages

### A. Parties' Contentions

Appellants assert in their opening brief that "[n]either Appellants nor Appellee challenge the lower court's ruling that the non-compete agreements are enforceable." Appellants assign error to the court's failure to enforce each Agreement's liquidated

18

damages clauses which fixed damages in the amount of $50,000 for any breach of the Non-Compete. Appellants observe that Cantwell-Cleary "argued for, and received, a judgment for 'actual damages' flowing from a misappropriation of trade secrets[,]" a form of relief "not mentioned in the non-compete agreement or bargained for at the time of contract formation." Appellants assert "[n]either party could have known if the breach could implicate MUTSA." In their view, damages were impossible to calculate at the time of contract formation because "[n]either party could know which customers might leave Appellee . . . or know what the sales volume for a given customer might be decades into the future." Therefore, Appellants press, a liquidated damages award of $50,000 was reasonable and Cantwell-Cleary should be held to its bargain.[7]

Cantwell-Cleary responds that the liquidated damages provisions contained within the Non-Compete agreements at issue are unenforceable because "the only evidence in the record is that the $50,000.00 figure was designed to scare a newly hired employee." Pointing our attention to *Willard Packaging Co. v. Javier*, 169 Md. App. 109 (2006), Cantwell-Cleary asserts that we declared an identical liquidated damages provision in that case to be unenforceable because there was no evidence that the employer suffered *any* actual damages. Here, Cantwell-Cleary insists, the liquidated damages provision at issue is unenforceable due to a lack of effort in estimating potential damages at the time of contract formation. Then, citing to out-of-state law, Cantwell-Cleary posits that evidence

---

[7] We note that Cantwell-Cleary's complaints against Appellants only alleged violations of the covenant not to compete and did not include allegations of any violations of the duty of confidentiality provisions of the Agreements.

19

of actual damages is admissible where a liquidated damages clause is unenforceable.

Appellants counter that Cantwell-Cleary never argued in the circuit court that any aspect of the Non-Compete, including the liquidated damages provision, was unenforceable. As Appellants point out in their brief, when the trial court asked Cantwell-Cleary if it was asking for liquidated damages under the Non-Compete, counsel for Cantwell-Cleary responded that it wasn't because "it'd be duplicate of damages if you awarded it." Accordingly, Appellants invoke the doctrine of judicial estoppel, insisting that Cantwell-Cleary persuaded the trial court that the non-compete was valid, and, quoting *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001), urge that Cantwell-Cleary "should not be permitted to lead a court to find a fact one way and then contend in another judicial proceeding that the same fact should be found otherwise."

We agree with Appellants that Cantwell-Cleary's wayward argument is not preserved. Regardless, both parties' arguments fall wide of the mark because Cantwell-Cleary sought and was awarded damages under its separate statutory claims for misappropriation of trade secrets. Before we recite the applicable decisional law, we review some additional facts.

## B. Background

At trial, substantial evidence was produced indicating that Appellants had each signed a copy of the company's standard Non-Compete before those copies were lost or destroyed, leading the circuit court to find that the non-competes existed "and that they're now gone." Appellants no longer challenge that finding on appeal and concede that the Agreements exist and are enforceable.

20

Cantwell-Cleary's standard Non-Compete agreement begins as follows:

> I understand that Cantwell-Cleary Co., Inc. has worked hard over the years to develop client lists, marketing plans, pricing strategies and vendor relationships which are integral to the Company's present and future success. In consideration for my compensated services as a Cantwell-Cleary employee and $50, the receipt of which is acknowledged[,] . . . .

In the succeeding terms, the Agreement contains two sub-parts, each with its own liquidated damages clause. The first sub-part pertains to the employee's duty of confidentiality and provides, in relevant part, as follows:

> I agree to keep confidential during the tenure of my employment information which is important to the Company's ability to compete, specifically the following information:
>
> 1. All customers of Cantwell-Cleary;
>
> 2. The prices charged any customer for products purchased from Cantwell-Cleary;
>
> 3. The names of Cantwell-Cleary's vendors and suppliers;
>
> 4. The prices charged Cantwell-Cleary by any of its vendors or suppliers; and
>
> 5. The contents of any marketing, sales, business or promotional plans used by the Company.
>
> **I understand and agree that the Company will be injured if I disclose any of the above information to a third-party without authorization and that the extent of such damage will be irreparable and substantial. I also realize that litigation in court is expensive and time consuming. Therefore, I agree to pay unto Cantwell-Cleary Co., Inc. the sum of $50,000, as and for liquidated damages, and not as a penalty, in the event that I breach this duty of confidentiality**. I agree that such a sum is a fair and reasonable sum . . . .
>
> **The obligation to pay such liquidated damage does not preclude Cantwell-Cleary Co., Inc.'s other rights it may have against me for such a breach, including as an example, only, the right to seek injunctive relief, which other rights the Company specifically reserves**.

21

(Emphasis added).  The second sub-part contains the employee's Non-Compete agreement:

I agree that for the one-year period immediately following my termination of employment for any reason or for the period of time which I would receive royalty compensations from Cantwell-Cleary Co., Inc., I will:

(1) Not compete, directly or indirectly, either individually or as an officer agent, director, employee, partner, salesperson, or representative, or in any other capacity, in the business of selling packaging or paper products, or other related products within a 75-mile radius of the headquarters of Cantwell-Cleary Co., Inc., in Landover, Maryland.  The term "compete" in this agreement shall include, but not be limited to, selling, consulting, brokering, or assisting in the sale, consultation, or brokerage, of such products.

(2) Not obtain any ownership interest, either directly or indirectly, in any company or entity which competes with Cantwell-Cleary Co., Inc., within a 75-mile radius of its corporate headquarters.

(3) Not compete with Cantwell-Cleary Co., Inc. or engage, either directly or indirectly, in the sale, or solicitation for sale, of packaging or paper products or other related products sold by Cantwell-Cleary Co., Inc. with any customers of Cantwell-Cleary Co., Inc., whether as a result of my solicitation or otherwise.  The term 'customer' in this agreement shall mean any person or entity who has ever had an account with Cantwell-Cleary Co., Inc. up to and including the date of my termination. . . .

I agree that (a) the above covenants not to compete do not preclude me from engaging in gainful employment or from making a living, and (b) such covenants not to compete are reasonable in duration, area, extent, and in all other regards.

**I understand if I breach this covenant not to compete, the injury to Cantwell-Cleary will be irreparable and substantial.  I also realize that litigation in court is expensive and time consuming.  Therefore, I agree to pay unto Cantwell-Cleary Co., Inc. the sum of $50,000 as and for liquidated damages, and not as a penalty, in the event I breach any of the above covenants not to compete.**  I agree that such a sum is a fair and reasonable sum to pay . . . .

**The obligation to pay such liquidated damages does not preclude Cantwell-Cleary Co., Inc.'s other rights it may have against me for such**

22

**a breach, including as an example, only, the right to seek injunctive relief, which other rights the Company specifically reserves**.

(Emphasis added). At trial, the parties touched on the issue of liquidated damages during closing arguments. Specifically, the trial judge inquired:

> THE COURT: Before I forget. You said the liquidated damages clause [applies] if I find the non-competes exist for the recovery, but they all have this language, the application to pay such liquidated damages does not preclude Cantwell[-]Cleary's other rights it may have against me for such a breach including as an example only the right to seek injunctive relief, which other rights the company specifically reserves.
>
> So I understand there's the liquidated damages [clause], but there's also language in Mr. Ibbott's non-compete, Mr. DeGregory's non-compete, Mr. William Cleary's non-compete that they can seek other damages[.] And I'm going to follow up with [Cantwell-Cleary's counsel]. Is it your position the liquidated damages clause is the sole relief other than injunctive?
>
> [APPELLANTS' COUNSEL]: That is my position, Your Honor.
>
> *     *     *
>
> THE COURT: Did you contract away your rights as to other damages in the non-compete agreement as it relates to the civil conspiracy, your alleged negligence count and your trade secrets count [against Appellants], or would that be the other rights they may have?
>
> [CANTWELL-CLEARY'S COUNSEL]: Yeah. So, Your Honor, this comes up quite a bit in these kind of cases as you've probably seen over the years . . . . Plaintiffs in these cases have a choice, and I would submit the direct answer is Cantwell[-]Cleary did not contract away its rights to be limited to liquidated damages.
>
> But plaintiffs in these kinds of cases, Your Honor, have a choice. They can pursue liquidated damages and they need to make an election of that, or they can pursue actual damages. And what we see here, Your Honor, is from the inception of this case the plaintiff [has] always, always without fail sought actual damages. And that's consistent with the non-compete language, Your Honor, that you're referring to for Defendant Mr. Ibbott and the other co-conspirators.

The court proceeded to award injunctive relief against Appellants on Cantwell-Cleary's breach of contract claims based on their violation of the Non-Compete. Then, after finding that Appellants misappropriated trade secrets in violation of MUTSA, the court awarded money damages under CL § 11-1203 against Mr. Barstow in the amount of $780,757.32 and Mr. Ingram in the amount of $867,335.44.

## C. Analysis

Appellants challenge the damage awards against them as violations of the liquidated damages clauses in their Non-Compete agreements, and Cantwell-Cleary responds by challenging the enforceability of the liquidated damages clauses. As noted earlier, we consider those arguments largely beside the point. At the outset, we observe that at no point did Cantwell-Cleary make the argument before the trial court, as it does now, that the liquidated damages provisions functioned as unenforceable penalties. Therefore, the issue of the *enforceability* of the liquidated damages clauses is not preserved for our review. Md. Rule 8-131(a). Rather, the record is clear that, at trial, the parties argued over the *applicability* of the liquidated damages clauses and whether they effectively precluded Cantwell-Cleary from seeking monetary relief under its separate claims for misappropriation of trade secrets.

In arguing that Cantwell-Cleary was precluded from seeking monetary damages in excess of $50,000 as provided in the liquidated damages clauses, Appellants elide the exact rulings of the trial court, collapsing all of the separate claims under Cantwell-Cleary's claims for breach of contract. It seems both parties on appeal fail to understand the discrete nature of the relief awarded by the trial court. As reflected in the record, the trial court

awarded only *injunctive relief* against Appellants under Cantwell-Cleary's claims for breach of contract—violations of the Non-Compete. The Agreements expressly reserved Cantwell-Cleary's rights to seek injunctive relief for any breach of the covenants not to compete, and no damages were awarded under those claims. The court awarded damages against Appellants solely under Cantwell-Cleary's *statutory* claims for misappropriation of trade secrets. Considering that those claims arose under MUTSA, as opposed to the Non-Compete agreements, Appellants fail to explain exactly how the liquidated damages clauses even enter the equation. It is of course true that a valid liquidated damages clause normally provides the sole relief *for a breach of the agreement*, which "may not be altered to correspond to actual damages determined after the fact." *Barrie School v. Patch*, 401 Md. 497, 514 (2007) (quoting *Bd. Educ. Talbot Cnty. v. Heister*, 392 Md. 140, 156 (2006)). Here, the liquidated damages provision specified that Cantwell-Cleary was not precluded from pursuing "other rights it may have against [Appellants] for [] a breach." Even setting that language aside, Appellants offer no support for their contention that a liquidated damages clause for breach of contract bars monetary relief under an entirely separate *statutory* cause of action.

We recognize that there are some instances in which the existence of a contract between the parties can bar separate claims arising out of the same subject matter. For instance, a quasi-contractual claim, such as detrimental reliance, is ordinarily unavailable when an express contract exists between the parties. *Ver Brycke v. Ver Brycke*, 379 Md. 669, 693 n.9 (2004). Similarly, Maryland's economic loss doctrine prohibits a plaintiff from recovering tort damages premised on "negligence that causes purely economic harm

in the absence of privity, physical injury, or risk of physical injury," *Bel Air Carpet, Inc. v. Korey Homes Bldg. Grp., LLC*, 249 Md. App. 109, 128 (2021) (quotation omitted). Advocating, it seems, for a similar rule, Appellants strenuously assert that Cantwell-Cleary should not be allowed to "have its cake and eat it too" and must be limited to the contractual remedy of liquidated damages, even with respect to their statutory misappropriation of trade secrets claims. We do not agree.

It bears repeating that Cantwell-Cleary, wisely, pled its claims for breach of contract against Appellants solely based on breaches of the *non-compete* covenants of their respective Agreements. The non-compete covenants proscribe a broader range of conduct that is distinct from the misappropriation of trade secrets. For instance, had Appellants left Cantwell-Cleary to work for a competitor within the geographic area covered by their Agreements, they would have still been in breach of their contractual duties even if they took no proprietary information from the company. Of course, it is true that Appellants' solicitation of former clients was also prohibited under the Non-Competes, but it was the additional act of using and/or disclosing confidential customer and pricing information *to assist* in soliciting those customers that rendered Appellants liable for misappropriation of trade secrets.[8]

---

[8] On the other hand, the issue would be a closer call under the confidentiality portions of Appellants' Agreements. We note that throughout the course of this litigation, neither Cantwell-Cleary nor Appellants have ever claimed that the confidentiality provisions barred Cantwell-Cleary from seeking actual damages for misappropriation of trade secrets. To the contrary, at oral argument, Appellants' counsel reaffirmed several times that Appellants grounded their arguments solely on the premise that Cantwell-Cleary was prohibited from seeking damages beyond those provided under the non-compete portions of the Agreements.

We turn, therefore, to consult the statute governing Cantwell-Cleary's trade secrets claims. The Maryland Uniform Trade Secrets Act provides statutory remedies for businesses alleging misappropriation of trade secrets, and expressly provides as follows:

(a) Except as provided in subsection (b) of this section, this subtitle displaces conflicting tort, restitutionary, and other law of this State providing civil remedies for misappropriation of a trade secret.

(b)(1) This subtitle does not affect:
(i) *Contractual remedies, whether or not based upon misappropriation of a trade secret*;

CL § 11-1207 (emphasis added). Contrary to the statute's hardline prohibition on pursuing additional tort or restitutionary remedies, MUTSA contemplates that a claim for misappropriation of trade secrets and a claim for breach of contract—even one "based upon misappropriation of a trade secret"—may coexist. *Id.* The commentary to the parallel provision of the Uniform Trade Secrets Act, which is identical to CL § 11-1207(b)(1), likewise explains that the Act does not apply to "a duty voluntarily assumed through an express or an implied-in-fact contract" because "[t]he enforceability of covenants not to disclose trade secrets and covenants not to compete that are intended to protect trade secrets, for example, is governed by other law." UNIF. TRADE SECRETS ACT § 7 cmt. (UNIF. L. COMM'N 1985).

Because MUTSA explicitly directs that a breach of contract claim—regardless of whether said claim is "based upon misappropriation of a trade secret"—may be brought alongside a statutory claim for misappropriation of trade secrets, it is clear that the existence of an agreement that imposes liquidated damages for a breach of a confidentiality clause or other conduct that is similar to the misappropriation of trade secrets does not

necessarily foreclose the availability of monetary relief under MUTSA. CL § 11-1207(b)(1)(i). We observe that claims for misappropriation of trade secrets under MUTSA and breach of contract claims arising out of the breach of a related non-compete or non-disclosure agreement are commonly brought together. *See, e.g.*, *Padco Advisors, Inc. v. Omdahl*, 179 F. Supp. 2d 600 (D. Md. 2002) (breach of contract claim for violation of covenants not to compete and MUTSA claim for misappropriation of trade secrets brought together); *NaturaLawn of Am., Inc. v. West Grp., LLC*, 484 F. Supp. 2d 392 (D. Md. 2007) (same); *Waypoint Mgmt. Consulting, LLC v. Krone*, No. ELH-19-2988, 2022 WL 2528465 (D. Md. July 6, 2022) (same); *Philips N. Am. LLC v. Hayes*, No. ELH-20-1409, 2020 WL 5407796 (D. Md. Sept. 9, 2020) (same); *Albert S. Smyth Co. v. Motes*, CCB-17-677, 2018 WL 3635024 (D. Md. July 31, 2018) (same); *MCS Servs., Inc. v. Jones*, No. WMN-10-1042, 2010 WL 3895380 (D. Md. Oct. 1, 2010) (same).

In sum, we hold that, regardless of whether the liquidated damages provisions contained within Appellants' Non-Compete agreements were enforceable, Cantwell-Cleary was not foreclosed from obtaining damages for misappropriation of trade secrets under MUTSA. CL § 11-1207(b)(1)(i). By its own terms, the liquidated damages provision did not preclude Cantwell-Cleary from pursuing "other rights it may have against [Appellants] for [] a breach." Cantwell-Cleary did not seek damages for breaches of its contracts, but rather, it sought damages under separate statutory claims for misappropriation of trade secrets. Cantwell-Cleary sought only injunctive relief under its claims for the breaches of the covenants not to compete, as it was expressly permitted to do under the Agreements. Thus, we perceive no error on the part of the trial court in

distinguishing between the available remedies under these independent causes of action.

## III.

### Trade Secrets

### A. Parties' Contentions

Appellants assert that the circuit court's findings of liability for misappropriation of trade secrets were "conclusory and unsupported by the proper six-factor balancing test[,]" described in *Bond v. PolyCycle, Inc.*, 127 Md. App. 365, 372 (1999), for determining what constitutes a trade secret. They contend that Cantwell-Cleary's customer lists and pricing information do not qualify as trade secrets under MUTSA and they claim that the evidence did not establish that Appellants actually misappropriated any such information themselves. More specifically, Appellants argue that the customer lists and pricing information at issue could not have constituted trade secrets because "there [was] no unique formula or pattern or methodology other than hard work and providing good service" necessary to develop the information, which could be generated simply by cold calling businesses with packaging needs.

Appellants also maintain that the trial court only found "that Mary McCannon, Cindy Wood and Vincent, Jr., were responsible for downloading and removing information[,]" and then "broad brushed culpability upon Appellants without identifying the specific trade secret or that they 'stole' it themselves."

In response, Cantwell-Cleary contends that the six-factor balancing test has been preempted by the definition of "trade secret" as codified in MUTSA under CL § 11-1201(e). That definition delineates a two-part test which Cantwell-Cleary claims it met.

Under the first part, which concerns the economic value of the information, Cantwell-Cleary says the evidence established that their salespeople adjusted pricing and packaging information for each individual account, thereby developing a "recipe on how do you price and compete against that account." Because of the competitive nature of bidding in the industry, Cantwell-Cleary insists that the confidentiality of its pricing information was crucial in order to avoid being undercut by lower bids.

Turning to the second part of the test—which requires reasonable efforts to maintain the secrecy of a trade secret—Cantwell-Cleary emphasizes that it implemented "clearly defined policies regarding the security of its information and an employee's right to utilize that information." For example, Appellants and other employees signed the standard Non-Compete agreement, which included, in its first sub-part, provisions concerning the employee's duty of confidentiality. In addition, Cantwell-Cleary required employees to sign "technology acknowledgments" that stated, among other things: that employees were prohibited from transmitting "trade secrets" or "similar materials" from the company's "electronic communication systems"; that electronic messages "should be treated as confidential"; and that access to computers and other resources was "restrict[ed]" to "protect these systems against unauthorized access."[9] (Emphasis removed). Considering these measures, Cantwell-Cleary contends that it "took adequate measures to maintain the secrecy of its information under MUTSA[.]"

---

[9] Cantwell-Cleary explains that the company "utilizes a software program called DDI" to restrict the ability of employees to access sensitive information.

## B. Background

Cantwell-Cleary's historical account-specific pricing and customer information were presented at trial primarily through the testimony of William Cleary. He explained the value of this information in the following colloquy with Appellants' counsel on cross-examination:

DEFENSE COUNSEL: So there's no pricing strategy by Cantwell[-]Cleary, right?

MR. CLEARY: What do you mean there's no pricing strategy?

DEFENSE COUNSEL: Cantwell[-]Cleary doesn't have its own price list.

MR. CLEARY: Cantwell[-]Cleary allows the sales people to adjust the pricing for each individual account. That develops a pattern for each individual account and that really becomes a recipe on how do you price and compete against that account. If our competitors knew our costs and pricing and our pattern on how we priced the particular account, they could easily come in and say, you know, hey, we're 5 percent lower. They could over price a customer on a product grossly and then come in and look like a hero because, hey, I'm going to be in the discount because they weren't giving it to you before.

\*     \*     \*

DEFENSE COUNSEL: How about this, does Cantwell[-]Cleary have any pricing strategy that [is] written?

\*     \*     \*

MR. CLEARY: No there's – the pricing strategy is mostly taught to the sales people on what they – what margins they can sell each product at. And how they can price each customer. It's customer specific, product specific, boxes might be a different margin level. Floor mats might be a different margin level.

So you have to understand what the market is and the pricing. We might have a box and we might buy 20,000 of and we get a very good price from. And so, I'm sorry yeah, so we may get a very good cost from a vendor on that, so we know we can charge a little bit more, and make a little bit more

money as opposed to another box we only buy a hundred of. We don't have competitive advantage quantity, so therefore we have to adjust our pricing to stay below market price, to get the orders.

This information was tracked and stored on the company's internal computer system, DDI. According to Vince Jr., to access certain information on the DDI system, each employee was assigned a numeric level of access. Mary McCannon had the highest clearance; the average salesperson, however, only had an access clearance of 50, on a scale of 1 to 99. Vince Jr. explained that although salespeople could ask management to print off reports containing their lists of customers and pricing data, they would not have had the ability to print that information themselves with that level of clearance. As William pointed out, however, salespeople could view this information and would routinely receive printed reports from management.

The court admitted into evidence a copy of Cantwell-Cleary's employee handbook, which instructs: "[n]o employee will remove company property from the premises" including "[c]onfidential literature including cost pricing, sales, and customer information." All such property was to "be returned if your employment with the company is terminated, either voluntarily or involuntarily[,]" and all salespeople were required to sign the Non-Compete agreements under which, as set forth above, they agreed to keep the company's customer, vendor, and pricing information confidential. A separate memorandum similarly instructed employees that "electronic communication systems shall not be used to send (upload) or receive (download) copyrighted materials, software programs, trade secrets, proprietary financial information, or similar materials[.]"

The testimony at trial pointed to Vince Jr., Mary McCannon, and Kevin DeGregory

as the primary figures among the conspirators who actually took the company's proprietary information to Cleary Packaging.[10] For instance, Mary McCannon testified that when Vince Jr. was still with the company in 2018, he requested and received from her a compilation of Cantwell-Cleary's then-existing customer base.[11] Therese Cleary also testified that Ms. McCannon removed customer, pricing, and vendor information from her office before leaving for vacation the week prior to the walkout on July 16, 2018. Kevin DeGregory, as confirmed in trial exhibits, acknowledged that he sent lists of his customers showing profits and past sales to his personal email address shortly before the mass exodus.

Mr. Ingram, for his part, admitted that he copied down some useful information before departing for Cleary Packaging. Specifically, he created a list of the types of boxes used by his customers "with measurements, item numbers, and quantities." He also wrote down a list of his open orders showing "the material costs and how it broke down, the merchandise, what the actual order was for, the cost and the profit and [sic] the status" of each order.

William Cleary testified that he did not have any knowledge of an unauthorized download of customer information from the company's DDI system by Mr. Barstow;

---

[10] The court stated in its ruling that it "believe[d] [Vince Jr.] stole [information] through the salesmen[.]"

[11] For example, Mary McCannon testified that Vince Jr. asked her to send him a "master list of Sheila Firestein['s] . . . customers with their information and contact numbers[.]" Pursuant to that request, McCannon agreed that Plaintiff's Exhibit 23 depicted an email that she sent Vince Jr. on May 22, 2018, with Firestein's "customer master" as an attachment. The list, as attached to the email, contained contact information and other pertinent data for thirty-three of Firestein's customers.

however, William insisted that a surreptitious printout was not necessary because Appellants had access to the information on the DDI system:

> You could have a notepad and sit there and copy the information. You could take a screen shot, okay, of what's on the computer. You could have the files of reports that your sales manager may have given you at different points while you were there. And you could have that information in your file.
>
> So if the day before the walk out, would they need to stop and print everything, they may have already collected the information over time.

Ultimately, the trial court found that each Appellant had misappropriated Cantwell-Cleary's confidential customer and pricing information, pointing in particular to testimony from former customers that they bought materials from Appellants at the same prices after they transitioned to Cleary Packaging. The court expounded:

> And then in terms of the trade secrets, I mean, the information had formula, patterns, methods and techniques that derived independent economic value. How do we price a product, how do we sell a product, how do we create the margin so that we can generate something to sell? What vendors do we use, how do we use them? What are the special efforts made?
>
> And the customer list, the vendor pricing, the profit margins, the pricing to customers, the receivables, the good will of the salesmen these were all used [sic] and the court finds them to be trade secrets. And they were all used to cause unjust enrichment and actual loss by their misappropriation.
>
> Go back to what [a former and current customer of Mr. Ingram] told us on July 30th. When Mr. Ingram called, yep, he sold me exactly pretty much what I had before. If I know what to price it for, and I know how to cut my competitor, I can make a whole lot of money, because we're talking pennies on the dollar here. And when we're talking thousands and thousands of items, it all adds up. That's been proven.

### C. What Constitutes Misappropriation of a Trade Secret?

Maryland adopted the Uniform Trade Secrets Act in 1989. *See* 1989 Md. Laws, ch. 598 (S.B. 667). Under the Act, misappropriation of a trade secret is the:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) Disclosure or use of a trade secret of another without express or implied consent by a person who:
> (i) Used improper means to acquire knowledge of the trade secret; or
> (ii) At the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was:
>> 1. Derived from or through a person who had utilized improper means to acquire it;
>> 2. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>> 3. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
> (iii) Before a material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

CL § 11-1201(c). In turn, a trade secret is defined as follows:

"Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

CL § 11-1201(e).

Prior to the enactment of MUTSA, when determining whether particular information constituted a trade secret, Maryland courts looked to the non-exhaustive list of factors originally proposed in 1939 in comment b, § 757 of the RESTATEMENT (FIRST) OF TORTS, which was later adopted in Maryland in *Space Aero Products Co., Inc. v. R.E. Darling Co., Inc.*, 238 Md. 93, 105 (1965). *See LeJeune v. Coin Acceptors, Inc.*, 381 Md. 288, 303–04 (2004). In *Optic Graphics, Inc. v. Agee*, this Court explained that, even after

the adoption of MUTSA, the Restatement factors "still provide helpful guidance to determine whether the information in a given case constitutes 'trade secrets' within the definition of the statute[,]" because that definition "clearly 'is based on the *Restatement* comment[.]'" 87 Md. App. 770, 784 (1991) (quoting Peter B. Swann, Note, *Maryland Uniform Trade Secrets Act*, 49 Md. L. Rev. 1056, 1061 (1990)). Under the Restatement approach, "[s]ome factors" that courts may examine in determining whether particular information constitutes a trade secret include:

> (1) the extent to which the information is known outside of [the plaintiff's] business; (2) the extent to which it is known by employees and others involved in [the plaintiff's] business; (3) the extent of measures taken by [the plaintiff] to guard the secrecy of the information; (4) the value of the information to [the plaintiff] and to [plaintiff's] competitors; (5) the amount of effort or money expended by [the plaintiff] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* at 783 (quoting RESTATEMENT (FIRST) OF TORTS § 757 cmt. b (AM. L. INST. 1939)).

In *Optic Graphics*, this Court recognized that "[p]ricing information and marketing strategy are protectable as 'trade secrets'" so long as, tracking the two-part test under CL § 11-1201(e), the information, "(1) hold[s] 'independent economic value' because it is not 'generally known' to or readily ascertainable by others who stand to benefit economically if they use or disclose it, and (2) [was] the subject of reasonable efforts to maintain its secrecy." *Id.* at 787. In that case, in order to perform his job as an estimator in Optic's printing department, Mr. Agee was provided with the company's "pricing, material cost, mark-ups, profit margins, machine cost rates, production rates, and marketing strategies." *Id.* at 775. After Mr. Agee formed a competing business, Optic brought suit seeking

injunctive relief against Mr. Agee for allegedly retaining and using this confidential information. *Id.* at 776–78. The trial court held that the information did not constitute trade secrets and we affirmed. *Id.* at 780, 787–88. We explained that the trial court did not clearly err in determining that the allegedly misappropriated pricing information would not have had economic value to Mr. Agee because it was "peculiar to [Optic] and that is who can use [the information] to the best advantage." *Id.* at 787. As found by the trial court, the pricing information "was (1) subject to change, (2) subject to market forces, [and] (3) subject to the type of machinery used," making it "composed of so many variables that it was generally subject to change and specific to Optic." *Id.* at 787–88. Moreover, the trial court correctly found that Optic's efforts to keep the information confidential "fell well short" because of its uneven use of confidentiality agreements. *Id.* at 785, 788.

Conversely, in *LeJeune v. Coin Acceptors, Inc.*, the Maryland Supreme Court held that the customer and pricing information taken by a former salesperson did constitute trade secrets. 381 Md. 288 (2004). There, the employee, William LeJeune, worked in sales for Coin Acceptors ("Coinco") and developed a detailed knowledge of "Coinco's pricing, pricing strategies, marketing and business initiatives, and selling strategies[.]" *Id.* at 294–95. Before leaving for a similar position with Mars, a competitor, LeJeune "on three separate occasions, had transferred or 'burned' digital copies of numerous documents from his Coinco laptop to a compact disc[.]" *Id.* at 296. Among other proprietary documents, LeJeune copied "Coinco's Executable Budgeting Software, which includes Coinco's manufacturing costs and profit margins" as well as "pricing information related to Coinco's Specialty Markets Strategic Plan." *Id.* Coinco then sought and was granted a preliminary

injunction prohibiting LeJeune from using or disclosing any of this information. *Id.* at 298–99. LeJeune noted a timely interlocutory appeal of that order and the Supreme Court of Maryland issued a writ of certiorari on its own initiative. *Id.* at 299.

The Court commenced its analysis "by examining whether the alleged trade secrets in this case qualify as such under the Maryland Uniform Trade Secrets Act." *LeJeune*, 381 Md. at 306. Looking to *Optic Graphics* and several federal district court cases that had occasion to interpret the definition of trade secret under CL 11-1201(e), the Court concluded that Coinco's proprietary information satisfied the MUTSA definition of trade secrets. *Id.* at 306–11. In particular, the Court observed that Coinco "had compiled in its Executable Budgeting Software, Specialty Markets Strategic Plan, and hard-copy pricing documents a vast amount of information related to its manufacturing costs and profit margins." *Id.* at 309. Especially due to the highly competitive nature of the market in which Coinco operated, "Coinco's cost and profit information, if available to Mars, could allow Mars to undercut all of Coinco's prices, giving Mars an easy economic advantage." *Id.* at 310. The Court also explained that Coinco went to great lengths to protect the secrecy of the information, including executing confidentiality agreements with its customers and directing employees to keep the information confidential in the employee handbook. *Id.* at 310–11. The Court concluded that, under those circumstances, "the pricing and cost data contained on the Specialty Markets Strategic Plan, Executable Budgeting Software, and other hard-copy pricing documents qualify as trade secrets under MUTSA." *Id.* at 311.

The Court in *LeJeune* turned next to consider whether Coinco had established that LeJeune actually misappropriated the trade secrets. *LeJeune*, 381 Md. at 311. LeJeune

argued that he did not acquire any information improperly because Coinco voluntarily provided him with the documents and did not ask for their return. *Id.* The Court rejected this argument, stating that "Coinco did not give LeJeune permission to transfer trade secrets from the company laptop to a CD." *Id.* at 313.

In *Albert S. Smyth Co., Inc. v. Motes*, No. CCB-17-677, 2018 WL 3635024 (D. Md. July 31, 2018), the United States District Court for the District of Maryland determined, *inter alia*, that the plaintiffs—five jewelry businesses collectively referred to as "Smyth"— had, in their third amended complaint, sufficiently alleged that defendant John Jackson III misappropriated their trade secrets under MUTSA and its federal analogue, the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836, and thus the court denied Jackson's motion to dismiss those claims. The complaint alleged that a partner of Smyth, Mark A. Motes, resigned from Smyth in November 2016 and "took more than thirteen employees with him," including Jackson. *Id.* at *1. Allegedly, more than a year earlier, Jackson began "copying [Smyth's] business information to a Dropbox account" as part of a joint plan with Motes to start a competing business. *Id.* at 2. Smyth asserted that this information, which included "decades of 'customer records and lists' that contain[ed] 'the buying habits of over 69,000 customers' and the company's 'pricing information, vendor relationships and business strategies[,]'" constituted trade secrets under DTSA and MUTSA, and that Jackson misappropriated the information by accessing it after leaving Smyth. *Id.* at *4.

Recognizing the substantial similarity between the DTSA and MUTSA, the district

court focused its analysis on the DTSA.[12] The court first found that Smyth adequately alleged the existence of trade secrets under DTSA. *Id.* at *3–4. As described in the complaint, Smyth took steps to protect its records by prohibiting employees from disclosing "company information[,]" instructing employees on how to keep confidential information safe, and warning employees that violations of its confidentiality policies may lead to termination. *Id.* at *3. Moving on, the court found that the records were "valuable by virtue of their confidentiality" and that:

> In a competition for sales, information about potential customers and their buying habits, a competitor's pricing, business strategies, and vendors is a windfall, granting the recipient a key to undercut the competition's pricing, outbid their vendor contracts, and attract their customers.

*Id.* at *4. Because Smyth took "reasonable steps to protect the confidentiality of [the] business records and their value derives from their confidentiality, they constitute[d] trade secrets" under the DTSA. *Id.* at *4.

The court next considered whether, under the DTSA, the complaint adequately alleged that Jackson actually misappropriated Smyth's trade secrets. Of particular import was the allegation that the Dropbox "folders were accessed [by Jackson] after [he] filed

---

[12] *See Philips N. Am. LLC v. Hayes*, No. ELH-20-1409, 2020 WL 5407796, at *7 (D. Md. Sept. 9, 2020) ("[T]he majority of the elements of a misappropriation claim under the DTSA and the MUTSA are substantially the same . . . . The primary difference . . . is that the DTSA only allows for a private cause of action where the alleged trade secrets are 'related to a product or service used in, or intended for use in, interstate or foreign commerce.'") (citation omitted); *Md. Physician's Edge, LLC v. Behram*, No. DKC 17-2756, 2019 WL 4573417, at *5 (D. Md. Sept. 20, 2019) ("Both DTSA and MUTSA require not only the existence of a trade secret, but also 'misappropriation' of that trade secret. Both statutes define that term in substantially the same manner[.]").

Articles of Organization for a competing jewelry business," which "ma[de] it plausible" that he indeed used and therefore misappropriated the trade secrets. *Albert S. Smyth Co.*, 2018 WL 3635024, at *4. Accordingly, the court denied Jackson's motion to dismiss Smyth's claim under the DTSA. *Id.* at *4.

Turning to the MUTSA, and mirroring its analysis of the DTSA claim, the court stated that: "[b]ecause Smyth took reasonable steps to secure the secrecy of its business records, because the value of the information is not readily ascertainable from the marketplace and thus derives its value from its confidentiality, and because the complaint alleges that Jackson . . . accessed [the Dropbox files] after he left Smyth and started a competing jewelry business, this claim survives as to Jackson[.]" *Id.* at *6. Thus, the court also denied Jackson's motion to dismiss Smyth's MUTSA claim.

More recently, in *Philips North America LLC v. Hayes*, the United States District Court for the District of Maryland denied Hayes's motion to dismiss Philips's complaint for misappropriation of trade secrets after the court concluded that pricing and customer information could constitute trade secrets under MUTSA and DTSA. No. ELH-20-1409, 2020 WL 5407796, at *8–10 (D. Md. Sept. 9, 2020). As a sales director for Philips, a manufacturer of medical equipment and technology, Hayes led much of the company's sales efforts and was entrusted "with a considerable amount of secret, confidential and proprietary information" including "equipment manufacturing information, national product supply funnel information, business and strategic plans, marketing, account strategies, pricing, national orders and sales, and relationships with customers and clients[.]" *Id.* at *1–2 (internal quotation marks omitted). While still employed by Philips,

41

Hayes accepted a similar position with GE Healthcare, a direct competitor of Philips, but neglected to inform the company for six weeks. *Id.* at *3. In that timeframe, a "search of Hayes's Philips-issued computer revealed that Hayes printed about 40 documents" which allegedly included "lists of pending orders and sales funnels for the United States; information regarding manufacturing status of completed sales . . . and information regarding specific Philips customers, orders, pricing, and sales initiatives." *Id.*

Philips brought suit against Hayes, alleging that, using this proprietary information, Hayes solicited "on GE Healthcare's behalf, a large health system customer with whom Hayes worked while at Philips." *Philips*, 2020 WL 5407796, at *4 (internal quotation marks omitted). Hayes moved to dismiss the complaint and the court denied his motion. *Id.* at *11. Citing *Albert S. Smyth Co.*, 2018 WL 3635024, at *4, the court reasoned that the documents printed and taken by Hayes could qualify as trade secrets under MUTSA. *Id.* at *8. Citing *LeJeune v. Coin Acceptors, Inc.*, 381 Md. at 309–10, the court observed that "Maryland courts have repeatedly found that business plans, pricing and cost information, and customers lists for companies operating in competitive sales industries derive independent economic value from their confidentiality." *Id.* (citations omitted). Likening the case to *LeJeune*, the court reasoned that the documents printed by Hayes generated independent economic value because they contained "information that was difficult, costly, and time-consuming to develop." *Id.* at *9. Due to the highly competitive market in which Philips and GE Healthcare competed, the "pricing and customer information, if available to a competitor such as GE Healthcare, could allow GE Healthcare to undercut Philips' pricing and gain an economic advantage." *Id.* Accordingly, because

42

Philips took reasonable steps to ensure the confidentiality of this information—including limiting technology access and requiring employees to sign non-disclosure agreements—the documents could qualify as trade secrets under MUTSA. *Id.* at *9–10. Furthermore, the court determined that Philips's allegations were "readily sufficient" to constitute misappropriation under the DTSA and MUTSA. *Id.* at *10 (citations omitted).

## D. Analysis

Returning to the present case, we focus our analysis on two central questions. First, did Cantwell-Cleary's internal customer and pricing information qualify as trade secrets under MUTSA? Second, precisely what trade secrets did Cantwell-Cleary prove Appellants misappropriated through use or disclosure?

### 1. Trade Secrets

Our first issue is further partitioned by the two-part test contained in MUTSA's definition of trade secret, set out above and again here, as:

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

CL § 11-1201(e). Applying the definition, as well as the foregoing cases that have interpreted its provisions, we hold that Cantwell-Cleary's internal database stored confidential account-specific information for each customer's purchasing history that

43

qualified as information constituting trade secrets under section 11-1201(e) of MUTSA.[13]

First, as summarized in *Philips*, customer information often derives independent economic value in a competitive sales industry because "information about potential customers and their buying habits, a competitor's pricing, business strategies, and vendors is a windfall, granting the recipient a key to undercut the competition's pricing, outbid their vendor contracts, and attract their customers." *Philips*, 2020 WL 5407796, at *8 (quoting *Albert S. Smyth Co.*, 2018 WL 3635024, at *4). Here, William Cleary similarly explained the value of Cantwell-Cleary's account-specific pricing information, noting that:

> Cantwell[-]Cleary allows the sales people to adjust the pricing for each individual account. That develops a pattern for each individual account and that really becomes a recipe on how do you price and compete against that account. If our competitors knew our costs and pricing and our pattern on how we priced the particular account, they could easily come in and say, you know, hey, we're 5 percent lower. They could over price a customer on a product grossly and then come in and look like a hero because, hey, I'm going to be in the discount because they weren't giving it to you before.

We hold that the trial court did not err in determining that Cantwell-Cleary's confidential customer lists, vendor pricing, profit margins, and "pricing to customers"

---

[13] Applying the Restatement Factors we arrive at the same conclusion. *See* RESTATEMENT (FIRST) OF TORTS § 757 cmt. b (AM. L. INST. 1939). Specifically: (1) the trade secrets, comprising Cantwell-Cleary's confidential customer lists and related data, were not available to individuals outside of Cantwell-Cleary's business; (2) Cantwell-Cleary's staff, including its sales staff, had access to and routinely used the trade secrets to advance Cantwell-Cleary's business; (3) Cantwell-Cleary took reasonable steps under the circumstances to maintain the secrecy of the trade secrets; (4) the trade secrets had independent economic value in a competitive sales industry; (5) Cantwell-Cleary's use of DDI, the Non-Compete agreements, and policies requiring that the internal customer and pricing information remain confidential are evidence that Cantwell-Cleary undertook substantial efforts to in-fact keep the information secret; and (6) a competing business would ordinarily need to expend significant time and effort to independently acquire or duplicate Cantwell-Cleary's internal customer and pricing information.

constituted trade secrets because that information derived independent economic value after having been developed by the company over time, and because it was not generally known to competitors in a highly competitive industry.

Second, as in *LeJeune*, Cantwell-Cleary took several reasonable steps to protect the information on its internal database. For example, the company restricted access to information on the database, assigning numeric levels of access clearance with the average salesperson having a clearance level of 50. As Vince Jr. explained, that level of clearance prevented salespersons from being able to print off account-specific information without managerial approval. Moreover, in the company's employee handbook, employees are told that "[n]o employee will remove company property from the premises" including "[c]onfidential literature including cost pricing, sales, and customer information[,]" which was to "be returned if your employment with the company is terminated, either voluntarily or involuntarily." Finally, as noted earlier, all salespersons were required to sign the Non-Compete agreements under which they acknowledged their duty to keep the company's customer, vendor, and pricing information confidential. In light of these considerable efforts, we agree with the trial court that Cantwell-Cleary took reasonable steps under the circumstances to maintain the secrecy of its internal customer and pricing information.

### 2. *Misappropriation*

Turning to the second inquiry, we examine whether the trial court correctly decided that Appellants misappropriated Cantwell-Cleary's trade secrets under CL § 11-1201(c). We note that CL § 11-1201 provides six alternative and equally sufficient ways for a plaintiff to demonstrate that a defendant misappropriated a trade secret. CL § 11-1201(c).

45

Appellants press that the trial court "broad brushed culpability upon [them] without identifying the specific trade secret or that they 'stole' it themselves." We do not accept Appellants' constrained reading of the law.

To prevail on a claim for misappropriation of trade secrets under MUTSA, a plaintiff may, but need not necessarily, prove that a defendant personally took some tangible trade secret. This is because MUTSA defines misappropriation to include the "**[d]isclosure or use** of a trade secret of another without express or implied consent by a person who . . . [a]t the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was":

1. Derived **from or through** a person who had utilized improper means to acquire it;
2. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
3. Derived **from or through a person** who owed a duty to the person seeking relief to maintain its secrecy or limit its use[.]

CL § 11-1201(c)(2)(ii)(1)–(3) (emphasis added). These provisions of the statute are aimed at Appellants' *disclosure* or *use* of a trade secret without permission. As we detail below, there was sufficient evidence in this case to support a finding that Appellants directly misappropriated trade secrets under CL § 11-1201(c)(2)(ii)(2) because, among other things, customers testified that they received the same packaging and pricing from Appellants at Cleary Packaging that they received at Cantwell-Cleary. Appellants were long exposed to Cantwell-Cleary's trade secrets, and even if they had not memorized them all, they could have easily written them down. A trade secret, such as the ingredients in

Coca-Cola®,[14] can be memorized and then unlawfully disclosed or used by a person who "acquired [it] under circumstances giving rise to a duty to maintain its secrecy"—such as the Appellants in this case.

The evidence was also sufficient to support a finding that Appellants misappropriated trade secrets that were "derived from or through" another person in violation of CL § 11-1201(c)(2)(ii)(1) and (3). In other words, the evidence showed that Appellants used Cantwell-Cleary's trade secrets and that they "knew or had reason to know" that another person, such as Vince Jr. or Ms. McCannon, either "utilized improper means to acquire" the trade secrets they used, or "owed a duty to the person seeking relief to maintain its secrecy[.]" CL § 11-1201(c)(2)(ii)(1) and (3). The Maryland State appellate opinions surveyed earlier, including *LeJeune* and *Optic Graphics*, did not concern multiple actors who were involved in the misappropriation—a circumstance that sets this case apart. Here, the trial court found that there were "a whole lot more than two people that were involved in this conspiracy."

We are not aware of any Maryland appellate opinions that have addressed circumstances governed by CL § 11-1201(c)(2)(ii)(1) and (3). Therefore, we once again turn to those federal cases that are instructive for their application of the corresponding provisions under the federal trade secrets statutes.

---

[14] *See Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115, 134 (D. Md. 2020) (stating that a defendant's "memorization ability [was] immaterial" in the context of a claim for misappropriation of trade secrets under DTSA and MUTSA and stating that, by analogy, "[i]f a person leaves the CocaCola Company after having memorized the formula for Coca-Cola®, that does not give him license to transmit the prized soft drink's recipe to PepsiCo").

In *Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*, the Eighth Circuit Court of Appeals considered, *inter alia*, whether the district court erred by dismissing Ahern Rentals, Inc.'s claims for misappropriation of trade secrets—under both DTSA and the Missouri Uniform Trade Secrets Act—against EZ Equipment Zone, LLC.  59 F.4th 948 (2023).  The pertinent facts were as follows:

> Ahern is one of the largest independently owned equipment rental companies in the United States.  Ahern provides heavy equipment rental and repair services and sells new and used equipment. . . .  To protect its sensitive data, Ahern requires its employees to sign non-disclosure, non-solicitation, and non-competition agreements.  Ahern's employee handbook also explicitly requires employees to safeguard the company's confidential information, which includes customer and vendor lists, pricing and marketing data, sales systems, training materials and personnel data.
>
> EquipmentShare is a relative newcomer in the equipment rental industry. . . . As it has grown, EquipmentShare has hired many former Ahern employees.
>
> In 2019, Ahern sued EquipmentShare and several of Ahern's former employees in both federal and state courts.  Several of the federal lawsuits have been consolidated as a multidistrict litigation (MDL) . . . .  These lawsuits are all premised on the same general allegation: EquipmentShare . . . engaged in a wide-ranging and unlawful conspiracy to increase its market share at Ahern's expense.  Specifically, Ahern alleges that . . . EquipmentShare . . . recruit[ed] Ahern's employees to steal Ahern's trade secrets before leaving . . . to work for EquipmentShare [and that] EquipmentShare then used Ahern's trade secrets to develop its telematics systems[.] . . .
>
> In November 2020, Ahern brought this lawsuit against EquipmentShare and included EZ . . . .  Like EquipmentShare, EZ is a newcomer in the equipment rental industry . . . .  Importantly, it is undisputed that EZ and EquipmentShare have a business relationship. . . .  EZ serves its users through software that is owned, operated, and managed by EquipmentShare.  For example, EZ requires its users to utilize EquipmentShare's "ES Track" and "ES Service" programs to monitor and maintain their rental equipment, respectively.

. . . Ahern alleges . . . that EZ is using the "customer lists, rental information, pricing information, and marketing strategies" that EquipmentShare illegally obtained from Ahern to monitor, service, and place its users' equipment. Further, Ahern alleges that EZ has "knowledge" that this information "was illegally obtained by EquipmentShare from Ahern." All told, this lawsuit is different from the others in the MDL in that it alleges a conspiracy between EquipmentShare and EZ to misappropriate Ahern's stolen trade secrets[.]

*Ahern Rentals*, 59 F.4th at 951–52. The district court dismissed EZ from the lawsuit after finding, among other things, that "Ahern's complaint did not allege facts plausibly demonstrating EZ's involvement in EquipmentShare's alleged misappropriation of trade secrets[.]" *Id.* at 952. The Eighth Circuit disagreed, and held that the district court erred in dismissing Ahern's claims under DTSA and the Missouri Uniform Trade Secrets Act. *Id.* at 956.[15] First, the Eighth Circuit found that Ahern had adequately alleged that the purportedly misappropriated information qualified as trade secrets. *See id.* at 955. The court then addressed whether Ahern also adequately alleged that the trade secrets were "misappropriated":

> The closer question is whether Ahern plausibly alleges that EZ has "misappropriated" th[e] trade secrets. . . .
>
> . . . Ahern's complaint provides sufficient factual material to allow us to "draw the reasonable inference" that misappropriation occurred. . . . The complaint details . . . that EZ and EquipmentShare have a close business relationship. For example[] . . . EZ requires its users to use EquipmentShare's programs, including ES Track and ES Service, to service their equipment and maximize rental rates. . . . According to Ahern, EquipmentShare developed these programs by exploiting Ahern's trade secrets. Ahern also alleges that the market information used by EZ to develop profitable utilization and rental rates is based on Ahern's trade secrets illegally obtained by EquipmentShare. . . . Ahern pleads enough facts

---

[15] The Eighth Circuit stated that it could consider Ahern's claims under DTSA and the Missouri Trade Secrets Act together "[b]ecause these statutes are essentially identical[.]" *Ahern Rentals*, 59 F.4th at 955.

49

to make it entirely plausible that EZ is at least *using* systems developed by EquipmentShare through the exploitation of Ahern's trade secrets.

But to state a claim for misappropriation, **Ahern must plausibly allege that EZ "*knew or had reason to know*" that these trade secrets were improperly acquired by EquipmentShare**. 18 U.S.C. § 1839(5)(B)(ii)(I) (emphasis added). On this point, Ahern's allegations are pled only on "information and belief." However, such pleadings are appropriate here. The rest of Ahern's detailed allegations, taken as true, make clear that EquipmentShare's programs were at the core of EZ's operations. Based on these detailed allegations, it is entirely plausible to infer that EZ *knew* it was using programs developed through the exploitation of trade secrets.

*Id.* at 956 (bold emphasis added). In other words, the Eighth Circuit found that Ahern sufficiently stated a claim for misappropriation of trade secrets under DTSA (and the Missouri Uniform Trade Secrets Act) based on the allegation that EZ used its trade secrets, and that EZ's knowledge of the trade secrets was "derived from or through a person[,]" namely EquipmentShare, "who had used improper means to acquire the trade secret[.]" 18 U.S.C. § 1839(5)(B)(ii)(I). *See also Blades of Green, Inc. v. Go Green Lawn & Pest, LLC*, No. SAG-22-00176, 2022 WL 326473, at *2, 4–6 (D. Md. Feb. 3, 2022) (finding plaintiff was likely to succeed on the merits of its misappropriation claims under DTSA and MUTSA where an "unabridged CSR Playbook"—which the court found to contain trade secrets—was emailed by a third party to one of the co-defendants, and stating that the co-defendant who received the email was likely "aware that his alleged receipt of the document from [the third party] was improper" (citation omitted)); *Sirius Federal, LLC v. Jelen*, No. 22-cv-00223-LKG, 2023 WL 2213929, at *11 (D. Md. Feb. 24, 2023) (denying a motion to dismiss misappropriation of trade secrets claims under DTSA and MUTSA because the plaintiff sufficiently alleged "that the [defendants] Former Employees acquired

50

[the plaintiff's] trade secrets by improper means and that they also used and disclosed those trade secrets to [co-defendant] Red River[,]" that "Red River acquired its trade secrets from the Former Employees[] while knowing that the trade secrets were acquired by improper means[,]" and that the defendants "used [the plaintiff's] trade secrets to gain an unfair hard start to develop designs and prototypes for the Navy") (citations omitted)).

Returning to this appeal, we start by recounting what is not in dispute: Appellants aggressively courted and sold products to many of their former customers upon departing for Cleary Packaging. They concede that point and testified to the same at trial. Appellants also do not appear to challenge the trial court's finding, as they summarize on page 34 of their brief, that "Mary McCannon, Cindy Wood and Vincent, Jr., were responsible for downloading and removing information."

According to Therese Cleary's testimony, Ms. McCannon removed customer, pricing, and vendor information from her office before leaving for vacation the week prior to the mass exodus on July 16, 2018. Ms. McCannon admitted at trial that she provided the company's master customer list to Vince Jr. in 2018 just before he departed to form Cleary Packaging. Although there was no direct testimony that Appellants viewed or consulted those documents to solicit their former customers, because "direct evidence of theft and use of trade secrets is often not available, the plaintiff can rely on circumstantial evidence to prove misappropriation by drawing inferences from perhaps ambiguous circumstantial evidence." *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 876 (N.D. Ill. 2001) (citation omitted); *see also SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1261 (3d Cir. 1985) ("[i]n most cases plaintiffs must construct a web of perhaps ambiguous

51

circumstantial evidence from which the trier of fact may draw inferences" and "[a]gainst this often delicate construct of circumstantial evidence there frequently must be balanced defendants and defendants' witnesses who directly deny everything" (quoting *Greenberg v. Croydon Plastics Co.*, 378 F. Supp. 806, 814 (E.D. Pa. 1974))).

Back to this case—although the trial judge did not explicitly name each individual that he believed was involved in misappropriating trade secrets, he clearly indicated that Vince Jr. was the ringleader, and that it was his goal to "destroy" Cantwell-Cleary.[16] Here, the evidence presented was sufficient to allow the trial court to draw the necessary inferences to conclude that Appellants used Cantwell-Cleary's confidential information in the course of their employment at Cleary Packaging—where they worked under Vince Jr. and with Ms. McCannon—in direct competition with Cantwell-Cleary. In the trial court's view, Appellants used Cantwell-Cleary's confidential custom-tailored information to compete for those accounts. Specifically, the trial court emphasized the testimony by former Cantwell-Cleary customers demonstrating that Appellants knew exactly how to price the products and services sold to them to undercut their competition.

There was also evidence that Appellants copied down confidential pricing and customer information. Specifically, Mr. Ingram created a list of the types of boxes used by approximately six of his customers "with measurements, item numbers, and quantities." He also wrote down a list of his open orders for fourteen customers, showing "the material

---

[16] The trial court also noted, for example, how Mr. Barstow was "burning up the phone lines" with Vince Jr. "every single time" that a major event happened, *e.g.*, when the demand for Cantwell-Cleary to produce the Non-Compete agreements was presented.

costs and how it broke down, the merchandise, what the actual order was for, the cost and the profit and [sic] the status" of each order.[17]

Even beyond the limited information Mr. Ingram admitted that he copied, it is clear that Appellants had access to a more expanded trove of information on Cantwell-Cleary's database. As William Cleary explained, Appellants had the ability to view all information on the database related to their customers' accounts, which they could "copy" or "take a screen shot" of, and Appellants were routinely given confidential sales reports by their managers. Given their combined decades of experience at Cantwell-Cleary, Appellants may well have memorized much of the customer and pricing information related to their specific accounts—at least for some period of time. As the United States District Court for the District of Maryland has recognized, the unauthorized use of a trade secret by a former employee who has committed it to memory can amount to the misappropriation of a trade secret. *See Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115, 140 (D. Md. 2020) ("If [defendants] are correct that they have committed Brightview trade secrets and/or proprietary information from the contested Brightview documents to memory, that information remains accessible to them, despite the emails' deletion" and could be used for future misappropriation.); RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 42,

---

[17] In his ruling, the trial judge described an instance in which Mr. Ingram plainly used his knowledge of Cantwell-Cleary's current inventories and the needs of its customers for the benefit of Cleary Packaging. Specifically, the judge found that Mr. Ingram "knew full well" that Cantwell-Cleary's stock of certain coolers was running low. Nonetheless, Ingram "didn't order" more of the coolers and, indeed, he indicated that there "was plenty of stock" available. But "the first thing [Ingram] did after leaving [Cantwell-Cleary] at 9, [and] getting hired [at Cleary Packaging] at 11, was put an order in at 12 for those same coolers[.]"

Reporter's Note to cmt. d (AM. L. INST. 1995) ("Although the distinction between information retained in memory and information embodied in appropriated records can be relevant in determining whether the information qualifies for protection, the defendant's reliance on memory is not a defense if the information is in fact a trade secret.").[18]

Although Appellants denied extracting any further information, it is clear that the trial court simply did not find their testimony credible. That is by no means surprising, especially considering Appellants' participation in the elaborate ruse to destroy the physical copies of their Confidentiality and Non-Compete Agreements—as well as their continuing denial (during trial) of ever having signed those agreements. These are archetypal credibility determinations that are inherently within the province of the trial court and we are loath to disturb them on appeal. *See* Md. Rule 8-131(c) (providing that in a case tried to the court, we must give "due regard to the opportunity of the trial court to judge the credibility of the witnesses.").

---

[18] Several of our sister courts that have addressed this issue have likewise concluded that information committed to memory, if it would otherwise constitute a trade secret, may still qualify for protection as a trade secret because the medium of information is not relevant to that determination. *See, e.g.*, *Ed Nowogroski Ins. v. Rucker*, 971 P.2d 936, 946–48 (Wash. 1999) (en banc) (collecting cases) ("The form of information, whether written or memorized, is immaterial under the trade secrets statute; the Uniform Trade Secrets Act makes no distinction about the form of trade secrets. Whether the information is on a CD, a blueprint, a film, a recording, a hard paper copy or memorized by the employee, the inquiry is whether it meets the definition of a trade secret under the Act and whether it was misappropriated."); *Al Minor & Assocs., Inc. v. Martin*, 881 N.E.2d 850, 853–55 (Ohio 2008) ("[T]he determination of whether a client list constitutes a trade secret . . . does not depend on whether it has been memorized by a former employee. Information that constitutes a trade secret pursuant to [the statutory definition] does not lose its character as a trade secret if it has been memorized. It is the information that is protected by the UTSA, regardless of the manner, mode, or form in which it is stored—whether on paper, in a computer, in one's memory, or in any other medium.").

In sum, we cannot say that the factual findings supporting the trial court's ultimate determination—that Appellants misappropriated Cantwell-Cleary's confidential customer and pricing information—are clearly erroneous. Nor do we perceive the trial court's decision as resting on any error of law. In this case, there was direct evidence that Mr. Ingram copied some of these trade secrets and took them to Cleary Packaging. There was also ample circumstantial evidence that Appellants: (1) had access to the Cantwell-Cleary's secure internal database and reports for many years, creating the possibility that Appellants copied, photographed, or committed the trade secrets to memory; (2) had a duty to maintain the secrecy of Cantwell-Cleary's trade secrets; (3) had access to the trade secrets that were taken by their co-workers from Cantwell-Cleary to Cleary Packaging; and, (4) were extremely successful in competing for and selling products to their former customers at nearly identical prices. We affirm the trial court's finding that Appellants engaged in misappropriation of trade secrets in violation of MUTSA.

## IV.

### Damages for Misappropriation of Trade Secrets

### A. Parties' Contentions

Appellants contend that Cantwell-Cleary's expert, Mr. Coleman, engaged in a speculative methodology to calculate the company's lost profits damages. They insist that the proper method for determining the actual lost profits is "to first determine [Cantwell-Cleary's] customers who actually left . . . and took that business to Cleary Packaging"; then "determine Cleary Packaging's gross sales that were made to [Cantwell-Cleary's] former customers for a period of 12 months"; and finally, "deduct from those sales the variable

55

costs[.]" Pointing to *Fowler v. Printers II, Inc.*, 89 Md. App. 448 (1991), Appellants emphasize that any calculation of lost profits must engage in that exact process to arrive at an accurate estimation of lost profits. Mr. Coleman's analysis, in Appellants' view, fell short of that standard insofar as he "rejected trying to match which customers left [Cantwell-Cleary] for Cleary Packaging" or account for "customers who might have left [Cantwell-Cleary] and gone to other competitors."

Cantwell-Cleary responds that our decision in *Fowler* stands for the broader proposition that courts may look to the past revenue records of an "established business" in estimating lost profits in the future. With respect to Mr. Coleman's methodology, Cantwell-Cleary explains that he arrived at a reliable "gross profit figure of 22.32%" by taking Appellants' gross sales revenues and subtracting variable costs such as the costs of the goods and commissions paid to Appellants. Then, accounting for the customers who remained with Cantwell-Cleary following Appellants' departure and the average rate of customer attrition, Mr. Coleman used past gross sales figures from 2017 and the profit rate to make a projection of lost profits through 2023. This method, in the company's view, was entirely proper and sufficiently supported the award of damages.

**B. Background**

At trial, it was undisputed that, in their time with Cleary Packaging, Mr. Barstow and Mr. Ingram had sold significant quantities of the same products to their former customers at Cantwell-Cleary. Referring to their responses to interrogatories, each appellant identified all of their former customers at Cantwell-Cleary and pinpointed which

56

customers had followed them to Cleary Packaging. This information was provided to Cantwell-Cleary, along with the gross sales to those clients through May 24, 2019.

To prove its damages attributable to lost sales, Cantwell-Cleary proffered Jeffrey Coleman as an expert witness. Mr. Coleman examined the sales reports of Appellants both at Cantwell-Cleary and Cleary Packaging and endeavored "to determine the amount of profits lost due to the event that happened in July of 2018." Specifically, Mr. Coleman noted that he calculated gross profits and identified "five areas that they lost": (1) "the sales from the salesmen that were no longer there"; (2) "sales because of the event where customers just decided to go elsewhere"; (3) "referral sales"; (4) "management time and effort" to cover the declining revenue; and (5) "management expertise that left and [sic] lost administrative help."

In his analysis, however, Mr. Coleman explained that he only included the first two areas of loss in his damage calculation, excluding the latter three as too difficult to trace. Looking to sales revenues from 2014, 2015, 2016, and 2017, Mr. Coleman calculated the company's year-to-year retention rate, concluding that Cantwell-Cleary lost around 3 percent of its customers per year. He also determined that Appellants' and Mr. Ibbott's combined gross sales ultimately resulted in an average of 22.32 percent profit for Cantwell-Cleary (what Mr. Coleman referred to as the "net profit percentage"),[19] based on gross sales, cost of goods sold, and commissions data for years 2015 to 2018.

---

[19] Although Mr. Coleman termed this number the "net profit percentage[,]" the exhibit containing his calculations—as well as his testimony—make clear that, to arrive at

[Footnote continued]

With those calculations in hand, Mr. Coleman projected Cantwell-Cleary's lost profits for Appellants and Mr. Ibbott through 2023 under the following approach. First, for each individual, Mr. Coleman calculated Cantwell-Cleary's expected future sales for each of the years 2019 to 2023, using past gross revenues from 2017 and after accounting for the retention rate, as the base measure. Then, Mr. Coleman deducted amounts for "[a]ctual (and projected) [s]ales [r]etained" by Cantwell-Cleary for Appellants' and Mr. Ibbott's respective accounts, and then applied the net profit percentage (accounting for cost of goods and commissions). Next, to arrive at the present value of the resulting figures (for each of the five years) Mr. Coleman applied a discount rate of 6.77 percent. To these results, Mr. Coleman added a separate calculation of lost profits for the period of August 1 to December 31, 2018, thus resulting in a lost profit calculation for the period of August 1, 2018, to December 31, 2023. Mr. Coleman explained that these calculations produced a relatively conservative figure because "we never thought accounts were going to go up which to me makes our number low because [sic] a lot of these would go up, I mean just with inflation and everything else it would've gone up." The exact calculations performed by Mr. Coleman, admitted as exhibits at trial, showed total claimed lost profits from the period of August 1, 2018, to December 31, 2023, in the amounts of $1,229,283.98 for Mr.

the purported "net profit percentage[,]" he did not deduct "the cost of the goods sold *and all additional expenses*." *Net Profit*, BLACK'S LAW DICTIONARY (11th ed. 2019). Rather, it is likely that Mr. Coleman may have meant "gross profit percentage[,]" which is also the term that, on appeal, Appellee has used to refer to this figure.

Barstow's accounts, and $1,397,530.37 for Mr. Ingram's accounts.[20]

On cross-examination, Mr. Coleman conceded that he had not taken out company overhead expenses in arriving at his estimates and had previously calculated a "gross profit rate of 18.44 percent." When asked whether he excluded from his calculations the sales attributable to former customers of Mr. Barstow and Mr. Ingram that left Cantwell-Cleary but did *not* follow them to Cleary Packaging, Mr. Coleman explained as follows:

> MR. COLEMAN: I did not have -- and I was given information about customers that had gone to Cleary Packaging but let's go back into my testimony, I was tasked with finding out what we lost, not what somebody else gained.
>
> DEFENSE COUNSEL: Okay. But you're opining as to the damages that each of the defendants had, say a customer that's [buying] 500,000 a year, goes to a competitor, you would apply those lost profits to the defendants.
>
> MR. COLEMAN: If they --
>
> DEFENSE COUNSEL: Right?
>
> MR. COLEMAN: -- happened in that year, yes.

---

[20] The trial court, however, did not award these full amounts. Instead, as explained in Appellee's brief, the trial court used a subset of Mr. Coleman's calculations as a base to award Cantwell-Cleary damages "from the commencement of Mr. Coleman's damages timeframe on August 1, 2018 through the final date of trial[,]" namely, September 1, 2021. As summarized by Appellee:

> [The trial court used] a per diem rate from the period of January 1, 2021 through December 31, 2021 calculated from Mr. Coleman's report to determine the damages sustained for the 243-day period from January 1, 2021 [to the] last day of trial on September 1, 2021. Each of these 243 day figures were then added to [Mr. Coleman's calculated lost profits] for each Appellant from August 1, 2018 to December 31, 2020 to come up [with the] final damages figures for Appellants Barstow ($144,149.70 + $636,607.62 = $780,757.32) and Ingram ($170,396.64 + $696,938.80 = $867,335.44).

When pressed on the matter, Mr. Coleman reiterated his position:

> THE COURT: Did you match the Cleary Packaging customers to Cantwell[-]Cleary customers, or was that not your –
>
> MR. COLEMAN: We started to do that exactly because we received a lot of information a month or so ago and trying to match that, and it became very clear to us that our task was not to deal with that information and I'm going to repeat what I just said before. Our task was, what did we lose, not what did they gain, because there's a big gap in my 50 years of experience that when there's a break-up so to speak, you keep some, you keep some, and some just fall away because they don't want to play in that game.
>
> I've had it with accounting firms, law firms, and medical practices and other commercial businesses where customers find that may be a good time to leave and go somewhere else.
>
> So it occurred to me when I did get that information and it's voluminous information and started to go through it, that that did not prove anything to anybody. That's what they got. I don't care what they got. I care what Cantwell[-]Cleary lost.

Finally, in explaining how he arrived at his future projections, Mr. Coleman explained that he utilized the sales numbers for Appellants provided by Cleary Packaging to complete his calculations for 2018, but otherwise excluded them. For all the future projections (*i.e.*, from 2019 on), Mr. Coleman used Appellants' gross sales figures from 2017 and did not consult what their actual sales numbers were at Cleary Packaging.

> The trial court awarded damages based on Mr. Coleman's calculations as follows:
>
> Mr. Coleman was an expert, he has special training and experience in accounting, valuations, and I'll give it the weight and value that I believe it should have. His testimony is relevant, he is qualified, his analysis is factually based under [Maryland Rule] 5-702. It's not my job to try the case, and I will say there's a hole in his evidence, but I can't fill it.
>
> He did a simple analysis where he took net profit to the company after cost of goods sold, and commissions deducted from total sales of salesmen based on averages in the past and future projections.

60

I know we have COVID, I know we've had a bit of a recession, but none of the defendants introduced any figures to show that Mr. Coleman's calculations may be different from what they are actually earning now. And I still don't have the company overhead, I wish I knew the net profit and not the gross profit, so I'm left with the evidence I have, and I'm left with the assumptions that appear to be reasonable.

* * *

Mr. Coleman, I already indicated I find him credible. And while I'm not a hundred percent convinced with his damage analysis, I don't have to be, it only has to be by a preponderance, I would have liked to know overhead, net profit, et cetera, but I don't have it.

* * *

Now, here's where I'm, I'll be candid, uncomfortable. I have to assess damages. And actual loss is a damage for violation of the Trade Secrets Act, as well as attorney fees, which I am reserving on. And the actual loss that I have, based upon the testimony from the plaintiff's witness, Mr. Coleman, is that Kevin Barstow caused $780,757.32 in loss profit for the breach of the trade secrets [of] Cantwell[-]Cleary.

That Dennis Ibbott caused $273,004.72 and that Timothy Ingram caused $867,335.44. As I said, I would've liked to have known overhead and net profit, but those are [the] gross profits that were presented to me, and there was no evidence to dispute that.

Based on the evidence that I have, I will assess damages against Mr. Barstow for $780,757.32, which is the actual loss from August 1st, 2018 to September 2nd, 2021. Against Mr. Ibbott in the amount of $273,004.72. And Mr. Ingram in the amount of $867,335.44.

### C. Actual Loss as the Measure of Damages Under MUTSA

Under MUTSA, "a complainant is entitled to recover damages for misappropriation" under the following measures of recovery:

(b) *Items included.* — Damages under this subtitle may include:

> (1) The actual loss caused by misappropriation; and

> (2) The unjust enrichment caused by misappropriation that is not taken into account in computing actual loss.

61

(c) *Alternative measure of damages.* — In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.

(d) *Exemplary damages.* — If willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under subsection (a) of this section.

CL § 11-1203(b)–(d).

Although Maryland State appellate courts have not had occasion to delve into the different measures of recovery under MUTSA, other courts have traditionally recognized, tracking the statute, that to obtain damages a plaintiff must: (1) prove an actual loss; (2) prove unjust enrichment; or (3) establish "a reasonable royalty for [the defendant's] unauthorized . . . use." *AirFacts, Inc. v. De Amezaga*, No. DKC 15-1489, slip op. at 18 (D. Md. Dec. 12, 2022) (alteration in original).

Concurrently, the RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 45 (AM. L. INST. 1995), recognizes that the plaintiff's loss (in contrast to the defendant's gain) may include "profits lost on sales diverted from the plaintiff by the appropriation, loss of royalties or other income that would have been earned by the plaintiff but for the appropriation, or the value of the trade secret if it has been destroyed through a public disclosure by the defendant." *Id.* cmt. d. Most common, and of particular import here, is the measure of lost profits, which the Restatement summarizes as follows:

> A frequent element of loss resulting from the appropriation of a trade secret is the lost profit that the plaintiff would have earned in the absence of the use by the defendant. The plaintiff may prove lost profits by identifying specific customers diverted to the defendant. The plaintiff may also prove lost profits through proof of a general decline in sales or a disruption of business growth following the commencement of use by the defendant, although the presence

62

of other market factors that may affect the plaintiff's sales bears on the sufficiency of the plaintiff's proof. If the evidence justifies the conclusion that the sales made by the defendant would have instead been made by the plaintiff in the absence of the appropriation, the plaintiff may establish its lost profits by applying its own profit margin to the defendant's sales.

*Id.* cmt. e.[21]

In this context, there are three fundamental limitations on damages for the plaintiff's loss. First, the alleged loss must be "attributable to the appropriation of the trade secret" and the plaintiff "bears the burden of proving the fact and cause of any loss for which recovery is sought." *Id.* cmt. b. Second, although the plaintiff may seek to prove both its own lost profits as well as the defendant's gains, the plaintiff "is permitted to recover only the greater of the two measures" so as to prevent a double recovery.[22] *Id.* cmt. c. Finally, the appropriate durational period for measuring damages is limited to "the period of time that the information would have remained unavailable to the defendant in the absence of the appropriation[,]" as measured by "the time it would have taken the defendant to obtain

---

[21] There is no indication that, in this case, Appellee attempted to prove its lost profits through proof of a "general decline in sales or a disruption of business growth following the commencement of use [of the trade secrets] by the defendant[.]" *See* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 45 cmt. e (AM. L. INST. 1995). Most obviously, there was no attempt to account for "other market factors" that may have affected Cantwell-Cleary's sales.

[22] The Uniform Trade Secrets Act, upon which MUTSA is based, does permit some simultaneous use of these measures, providing that "[d]amages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." UNIF. TRADE SECRETS ACT § 3 (UNIF. L. COMM'N 1985). Nonetheless, the comment to § 3 makes clear that it does not permit "double counting" and instead "adopts an express prohibition upon the counting of the same item as both a loss to the complainant and an unjust benefit to a misappropriator." UNIF. TRADE SECRETS ACT § 3 cmt. (UNIF. L. COMM'N 1985).

the information by proper means such as reverse engineering or independent development." *Id.* cmt. h.

As mentioned, we have not yet addressed the question of how to measure lost profits in assessing a plaintiff's actual loss for misappropriation of trade secrets. Our sister courts in both the state and federal systems, however, have done so and we glean insight from their well-reasoned analyses. For example, in *Jet Spray Cooler, Inc. v. Crampton*, the Supreme Judicial Court of Massachusetts reversed an award of damages in a case involving the misappropriation of trade secrets. 385 N.E.2d 1349 (1979). There, the trial court "computed the plaintiffs' lost profits at $257,068" by finding (1) that "the defendants had sold [infringing products] to over sixty of the plaintiffs' customers . . . and it was reasonably possible that the plaintiffs would have made the sales to these same customers" and (2) "that the defendants' sales to these customers totaled $2,856,311.41, and that during the accounting period the plaintiffs' net profits before taxes averaged nine per cent of gross sales." *Id.* at 1361. The Supreme Judicial Court considered that methodology to be sound, but nonetheless reversed that award of lost profits damages due to lack of causation. *Id.* at 1361–62. Specifically, the Court found that it could not "determine whether the plaintiffs' lost profits in this action were 'due to' the defendants' sales of products utilizing the trade secrets, or whether the plaintiffs' lost profits were 'due to' the plaintiffs' own business decision to refrain from marketing products" which incorporated the misappropriated information. *Id.*

Employing a similar analysis, in *Pioneer Hi-Bred International v. Holden Foundation Seeds, Inc.*, the United States Court of Appeals for the Eighth Circuit, applying

Iowa law, affirmed a lost profits award in a trade secret case. 35 F.3d 1226, 1243 (8th Cir. 1994). There, the district court awarded "$46,703,230 in lost profits" after adopting the methodology of the plaintiff's expert, Wagner. *Id.* at 1244. Because the defendant's product was not in direct competition with plaintiff's product, Wagner sought to quantify the amount plaintiff would have made "but for" the misappropriation "by considering the sales of 'look-alikes' from 1979 to 1989" and assumed that absent the misappropriation, plaintiff "would have obtained the same percentage of these sales as its market share in all other sales (36% average)." *Id.* From there, "Wagner computed lost profits of $140,109,691" and the trial court "reduced this amount by two-thirds reflecting its determination that Pioneer would not have obtained the full 36% market penetration[.]" *Id.* at 1244–45. The Eighth Circuit concluded that the district court "had a reasonable basis for its award" based on "[the defendant's] actual sales figures, the known productive capacity of [plaintiff's products], [plaintiff's] profitability history and a reasonable estimate of [plaintiffs'] lost share of the 'look-alike' market." *Id.* at 1245.

The parties in this case point us to *Fowler v. Printers II, Inc.*, in which this Court explained the proper methods for calculating damages in the related context of enforcing a non-solicitation covenant. 89 Md. App. 448 (1991). We glean some insight from *Fowler* in determining the proper methodology for arriving at an accurate assessment of lost profit damages. In that case, Fowler had worked for Printers as a salesperson and later took a job with Holladay-Tyler, a competing firm, where she "began contacting the accounts/customers which she had serviced at Printers." *Id.* at 455–56. Printers brought suit and obtained a judgment of $360,976 jointly against Fowler and Holladay-Tyler for

65

Fowler's breach of the non-solicitation agreement with Printers and for Holladay-Tyler's tortious interference with that contract, as well as an award of $50,000 for damage to Printers' reputation and loss of goodwill. *Id.* at 458. Fowler noted an appeal to this Court and we affirmed the trial court's award of damages.

*First*, we noted that an award of damages for Printers' lost profits was proper "as consequential damages from Fowler for breach of the contract, *and* from Holladay-Tyler for tortious interference with the contract." *Id.* at 473. In proving its damages, Printers had sought only "the profits lost on eight specific accounts upon which Fowler had worked while at Printers and which followed her to Holladay-Tyler." *Id.* After finding that five of the accounts had done business with Holladay-Tyler due to Fowler's solicitation in violation of the agreement, the trial court, we noted, calculated damages by "taking the gross value of each printing job performed for these five accounts by Holladay-Tyler during the one year period covered by the restrictive covenant and subtracting the variable, but not fixed, costs which would have been incurred by Printers if it had performed the job." *Id.* at 474. We considered this method to be entirely proper, especially because "[w]hen a party is suing for breach of contract . . . fixed costs 'need not be deducted from gross income to arrive at lost profit properly recoverable.'" *Id.* (quoting *Sloane, Inc. v. House & Assocs.*, 311 Md. 36, 42 (1987)).

*Second*, we considered Printers' cross-appeal—in which it objected to the court using Holladay-Tyler's sales in 1990 rather than Printers' sales in 1989 as the base measure for calculating lost profits—to be meritless. *Id.* at 476. Specifically, we explained that although "[e]vidence of past profits in an established business furnish a reasonable basis

66

for future profits[,]" the "profits made by others . . . in a similar business or under similar contract" provides an equally valid measure of recovery. *Id.* (quoting 11 W. Jaeger, *Williston on Contracts*, § 1346A (3d ed. 1968)). We observed that the trial court reasonably believed the latter method to be more feasible considering the "evidence that Printers' lack of equipment and resources might well have resulted in a decrease in its business in 1990, even if Fowler had remained at Printers[,]" thereby rendering "extrapolation from Printers' previous year's figures" a potentially speculative enterprise. *Id.* at 476–77 (citing *Macke Co. v. Pizza of Gaithersburg, Inc.*, 259 Md. 479 (1970)). Perceiving no error in the trial court's sound methodology, we affirmed the damages award.

## D. Analysis

Returning to the case at bar, we conclude that the circuit court erred in relying on Mr. Coleman's calculations of Cantwell-Cleary's actual loss, under CL § 11-1203(b)(1), because Mr. Coleman failed to provide an adequate rationale for his decision to use Cantwell-Cleary's past gross sales to Appellants' customers—rather than Cleary Packaging's *actual* sales to those customers—as a base to calculate lost profits; and because Mr. Coleman's damages calculations included losses attributable to customers who left Cantwell-Cleary but did *not* follow Appellants to Cleary Packaging, without proving those losses were *caused* by the misappropriation of the trade secrets. Separately, we conclude that the trial court erred in awarding damages for a period of approximately three years without explaining how the evidence established that the misappropriation of Cantwell-Cleary's trade secrets continued to cause losses for that entire period, given the rate at which prevailing pricing points may change in an evolving marketplace.

67

To start, we note that *Fowler* has limited application in the sphere of trade secret misappropriation. *Fowler* also involved the improper solicitation of former clients, but the cause of action was for breach of a broad non-solicitation clause and we considered the damages in *Fowler* to be a subset of consequential damages flowing from Fowler's breach of that agreement. *Id.* at 461, 473. As the Supreme Court of Maryland explained in affirming an award of lost profits based on projections which did not take "post-breach market evidence" of the 2008 recession into account, the measure of consequential damages is affected only by circumstances within the contemplation of the parties *at the time of contracting*. *CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 429 Md. 387, 405–06, 417–24 (2012). For that reason, as we noted in *Fowler*, an award of lost profits as consequential damages may be calculated based on the past profits of "an established business[,]" because such a predictable figure provides "a reasonable basis for future profits" which would have existed at the time of contracting. *Fowler*, 89 Md. App. at 473, 476 (quoting 11 W. Jaeger, *Williston on Contracts*, § 1346A (3d ed. 1968)). *But see id.* (suggesting that, where post-breach profits of defendant are available and market conditions have changed, it is "more feasible" to utilize the defendant's gross sales than extrapolate from plaintiff's past sales).

In the trade secrets context, the RESTATEMENT (THIRD) OF UNFAIR COMPETITION endorses a slightly different approach in measuring the plaintiff's actual loss. As the Restatement explains, "The plaintiff may prove lost profits by identifying specific customers diverted to the defendant. . . . If the evidence justifies the conclusion that the sales made by the defendant would have instead been made by the plaintiff in the absence

68

of the appropriation, the plaintiff may establish its lost profits *by applying its own profit margin to the defendant's sales*." RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 45 cmt. e (AM. L. INST. 1995) (emphasis added); *see also Jet Spray*, 385 N.E.2d at 1361 (arriving at lost profits calculation of $257,068 by taking defendant's gross sales to plaintiff's former customers, totaling $2,856,311.41, and applying plaintiff's net profit margin of 9%). In other words, at least when the data is available, it makes sense to measure the plaintiff's lost profits from the defendant's solicitation of the plaintiff's former customers by evaluating the defendant's *actual sales* rather than projections from the plaintiff's past experience. This approach has the benefit of focusing on economic reality (*i.e.*, the actual sales diverted using the misappropriated information) rather than predictive modeling.

Here, of course, Mr. Coleman did the exact opposite. Adamant that his task was to determine "what did we lose, not what did they gain[,]" Mr. Coleman explained that he utilized the sales numbers for Appellants provided by Cleary Packaging to complete his calculations for 2018, but otherwise excluded them. For all the future projections (*i.e.*, from 2019 on), Mr. Coleman used Appellants' gross sales figures from 2017 (their last full year at Cantwell-Cleary) and did not consult what the *actual* sales numbers were at Cleary Packaging. Given the approach that Mr. Coleman employed to prove Cantwell-Cleary's actual loss under CL § 11-1203(b)(1), we consider this to have been in error, at least without any explanation as to why it was more appropriate to use past figures to measure the sales improperly diverted from Cantwell-Cleary than the actual sales figures for the period of misappropriation. That does not mean past gross sales can never be used as a

baseline measure, *see, e.g., Pioneer*, 35 F.3d at 1243-45 (utilizing market share to approximate lost profits due to lack of direct competition with the infringing product), but there must be some rationale for ignoring the actual sales numbers in favor of utilizing past profits.

Cantwell-Cleary's problems, however, do not end there. In addition to excluding the sales figures provided by Cleary Packaging, Mr. Coleman also declined to account for loss attributable to customers who did *not* follow Appellants to Cleary Packaging.[23] Indeed, in a colloquy with defense counsel, Mr. Coleman explicitly noted that "we received a lot of information [about the customers that followed Appellants to Cleary Packaging] . . . and it became very clear to us that our task was not to deal with that information . . . [o]ur task was, what did we lose, not what did they gain, because . . . when there's a break-up so to speak, you keep some . . . and some just fall away because they don't want to play in that game." What Mr. Coleman failed to appreciate is that what Appellants gained and what Cantwell-Cleary lost, *as a result of the misappropriation* of confidential customer and pricing information, are the same thing: the sales diverted to Cleary Packaging. By sweeping in lost sales to former customers of Appellants that did not provide any business to Cleary Packaging, Mr. Coleman veered astray from the fundamental principle that any

---

[23] Mr. Coleman's protest that he was not given enough information to determine which of Cantwell-Cleary's customers left for other distributors is simply incorrect. Mr. Coleman acknowledged that he was provided with information about which of Appellants' former customers departed for Cleary Packaging. In his analysis, Mr. Coleman also deducted sales attributable to customers that Cantwell-Cleary retained, presumably meaning that he had a list of those customers as well. By process of elimination, any of Appellants' former customers that did not appear on either of those lists would fall into the category of customers who simply fell away.

claimed loss must be "attributable to the appropriation of the trade secret." RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 45 cmt. b (AM. L. INST. 1995).

Although damages in the trade secrets context certainly seek to compensate the wronged party for its actual loss, it remains the plaintiff's burden to "prove[] the fact and cause of any loss for which recovery is sought." RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 45 cmt. b (AM. L. INST. 1995); *see also Jet Spray*, 385 N.E.2d at 1361–62 (reversing an award of lost profits damages due to lack of demonstrated causation). At least with respect to the customers that did not follow Appellants to Cleary Packaging, Cantwell-Cleary did not carry its burden and Mr. Coleman erroneously swept the sales figures attributable to those customers into his analysis.

Finally, there remains the issue of the proper damages period. Although we disagree with Appellants that Cantwell-Cleary's damages could only flow for a period of one year, we are troubled by the trial court's award of lost profits damages for a period of three years. Damages are only appropriate "for the period of time that the information would have remained unavailable to the defendant in the absence of the appropriation[,]" as measured by "the time it would have taken the defendant to obtain the information by proper means such as reverse engineering or independent development." RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 45 cmt. h (AM. L. INST. 1995). Although we cannot say that a period of three years is inherently erroneous, we remain skeptical that Appellants would have been unable to arrive at an independent approximation of the prevailing pricing points in the industry in a period of three years by simple trial and error. Moreover, due to the changing nature of costs, it is far from clear that historical pricing data from several years

prior would even maintain any economic utility for such an extended period. Therefore, while we cannot foreclose the propriety of an award of three years of lost profits, we must conclude that it was necessary for the court to explain why that period was appropriate.

In sum, we hold that the trial court erred in awarding lost profits damages against Appellants based on Mr. Coleman's damage calculations because: (1) Mr. Coleman utilized Cantwell-Cleary's past gross sales as the base measure to project subsequent lost profits without any rationale as to why it was not more appropriate or feasible to instead use Appellants' actual gross sales to customers who left Cantwell-Cleary for Cleary Packaging; (2) Mr. Coleman swept in losses from Appellants' former customers that did not follow them to Cleary Packaging without demonstrating that those losses were caused by the misappropriation of Cantwell-Cleary's trade secrets; and (3) the court employed a damages period of three years without an explanation as to how Appellants continued to derive an economic advantage from potentially stale information for that entire period. Although we do not disturb the trial court's conclusion as to Appellants' liability for misappropriation, we shall vacate the damages portion of the February 14 Judgment against Appellants and order a limited remand for the parties, and the court, to remedy the errors identified in the damages calculation.

## V.

## Finding of Malice

### A. Parties' Contentions

Appellants assert that the trial court abused its discretion in clarifying the factual findings underpinning its decision to deny Cantwell-Cleary's motion for attorneys' fees.

72

Specifically, Appellants complain that after the court found that Appellants had *not* acted maliciously in denying Cantwell-Cleary's motion for fees, the court reversed course and entered an order clarifying that Appellants *had* engaged in willful and malicious conduct. Appellants assert that the court "failed to place its findings and reasoning on the record for reversing its finding regarding malice" and that the ruling was therefore "arbitrary and capricious, and a complete abuse of the discretion vested in the lower court." Accordingly, they request that the lower court's "finding of malice [] be vacated."

Cantwell-Cleary responds that the circuit court acted properly in clarifying that its findings "related narrowly to its exercise of discretion not to impose attorney's fees under MUTSA[.]" The company posits that "the [c]ircuit [c]ourt believed that it had sufficient grounds to find malice through Appellants' role in [the] conspiracy, and therefore enter an award of attorneys' fees, but instead exercised its discretion to not do so because the Appellants had not actually personally destroyed files[.]" (Emphasis removed). Referencing Appellants' role in the alleged plot to destroy the non-compete agreements of key employees and organize the mass exodus, Cantwell-Cleary observes the record amply supported the circuit court's clarification of its ruling denying attorneys' fees.

## B. Background

After the trial court's September 2, 2021 ruling from the bench finding Appellants liable for misappropriation of trade secrets, Cantwell-Cleary filed a petition for attorneys' fees under MUTSA. MUTSA provides that a court "may award reasonable attorney's fees to the prevailing party if: (1) [a] claim of misappropriation is made in bad faith; (2) [a] motion to terminate an injunction is made or resisted in bad faith; or (3) [w]illful and

malicious misappropriation exists." CL § 11-1204. Cantwell-Cleary's motion focused on the third ground and alleged that Appellants had willfully and maliciously misappropriated its proprietary customer and pricing information.

The trial court's decision on that motion, however, was delayed when Appellants each filed a "Suggestion of Stay" advising the circuit court that they had filed for bankruptcy. As we explained earlier, on November 1, 2021, the Bankruptcy Court entered separate orders modifying the automatic stay to permit the litigation in the circuit court to proceed, and the circuit court held a hearing on February 9, 2022, to address Appellants' motion for fees. At the hearing, the primary issue before the court on Cantwell-Cleary's motion for fees was whether Appellants had engaged in willful and malicious acts of misappropriation to permit an award of fees under CL § 11-1204(3). After hearing argument from the parties, the court denied the motion for fees. The court first explained that it had "no problem finding . . . willful action" but that the key question was "whether or not there was malicious appropriation." The court did not find malicious action on the part of Appellants, explaining its reasoning as follows:

> So when I start thinking about whether or not there's malice, as to the individual [d]efendants I can't make a finding that they deliberately -- that their intent was to deliberately cause harm or injury to the company. They're just three salesmen who wanted to pay their bills and didn't trust William Cleary, didn't trust Shirley Cleary, didn't trust [Therese] Cleary, and they really thought the only way they were going to keep their clients, pay their bills, and do their business was to go with Vince.

> So I'm sort of jumping ahead. I'm not going to make a finding as to whether the attorneys' fees were reasonable, because I'm going to jump ahead and I'm going to find that while there was willful action, the [c]ourt cannot find as to these three individual defendants that it was malicious as required under Bond v. [PolyCycle], and without the [c]ourt finding that each individual

74

[d]efendant acted maliciously, the [c]ourt is extremely uncomfortable proceeding on a co-conspirator liability action to consider damages as it relates to attorneys' fees, not damages, attorneys' fees.

The [c]ourt feels and the [c]ourt finds that the damages that were awarded were appropriate, but as the award of attorneys' fees would be discretionary and with the [c]ourt finding that each individual did not act maliciously, the [c]ourt would then have to impute co-conspirator liabilities to them to award the attorneys' fees, and the [c]ourt is just not comfortable doing that[.]

A written order denying the motion for attorneys' fees was entered on February 14, 2022. Thereafter, Cantwell-Cleary filed a motion to alter or amend requesting that the court clarify its factual findings supporting the denial of Cantwell-Cleary's motion for attorneys' fees. In that motion, Cantwell-Cleary explained that pursuant to 11 U.S.C. § 523(a)(6), debts attributable to willful and malicious injury inflicted by the debtor are excluded from discharge in bankruptcy.[24] Accordingly, to prevent the money judgment entered against Appellants from being discharged, Cantwell-Cleary requested that the court amend its ruling to clarify that its findings were limited to "exercising its discretion to deny the Attorneys['] Fee Motion (*i.e.*, the deletion of trade secrets and other documents by the defendants' co-conspirators), and that its ruling did not mean that the defendants['] breach of the non-compete agreements and violation of MUTSA was not willful and malicious."

---

[24] A discharge in bankruptcy has the effect of "void[ing] any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged" under the provisions of the Bankruptcy Code. 11 U.S.C. § 524(a)(1). The purpose of the discharge provisions is "to effectuate the 'fresh start' goal of bankruptcy relief." *In re Lindemann*, 375 B.R. 450, 464 (Bankr. N.D. Ill. 2007) (quoting *Vill. of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002)). However, 11 U.S.C. § 523(a)(6) provides that "a discharge under section 727, 1141, 1192, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt" that is "for willful and malicious injury by the debtor to another entity or to the property of another entity."

On April 13, 2022, the court entered an order granting Cantwell-Cleary's motion. In this order, the April 13 Clarification Order, the court explained that "the [d]efendants' conduct and violation of the Maryland Uniform Trade Secrets Act caused a deliberate and intentional injury to Cantwell-Cleary Co., Inc., that was wrongful and without cause or excuse, and constitutes willful and malicious conduct[.]" However, the court reiterated that "the finding of malice does not apply to [Cantwell-Cleary's] request for attorneys' fees[.]"

## C. Analysis

Though we acknowledge the broad discretion vested in the trial court in deciding whether to clarify its factual findings on a motion to alter or amend, we must vacate the court's reversal of its initial position without explanation.

To understand the contradictory nature of the trial court's order, it is necessary to return to the language of the statutory provision under which Cantwell-Cleary premised its motion for attorneys' fees. Specifically, CL § 11-1204 provides that a court "*may* award reasonable attorney's fees to the prevailing party *if*: (1) [a] claim of misappropriation is made in bad faith; (2) [a] motion to terminate an injunction is made or resisted in bad faith; or (3) [*w*]*illful and malicious misappropriation exists*." (Emphasis added). Under the plain terms of CL § 11-1204, although the trial court is ultimately imbued with discretion to fashion or not fashion a fee award (considering the inclusion of the discretionary term "may"), the court *must* make a factual finding of willful and malicious misappropriation as

76

a predicate to exercising that discretion.[25]  Here, at the February 9 hearing, the court made a clear factual finding that "while there was willful action, the [c]ourt cannot find as to these three individual defendants that it was malicious" particularly because Appellants were just "salesmen who wanted to pay their bills[.]"  Yet, in its superseding April 13 Clarification Order, the court purported to clarify that Appellants' "conduct and violation of the Maryland Uniform Trade Secrets Act . . . constitutes willful and malicious conduct" *except* as to the motion for attorneys' fees.  The conduct underlying the primary judgment

---

[25] Circuit courts must follow a similar two-step process in considering motions for attorneys' fees under Maryland Rule 1-341(a).  The Rule provides that:

> (a) **Remedial Authority of Court.** – In any civil action, if the court finds that the conduct of any party in maintaining or defending any proceeding was in bad faith or without substantial justification, the court, on motion by an adverse party, may require the offending party or the attorney advising the conduct or both of them to pay to the adverse party the costs of the proceeding and the reasonable expenses, including reasonable attorneys' fees, incurred by the adverse party in opposing it.

Md. Rule 1-341(a).  As we recently explained in *Matter of Jacobson*:

> To award attorneys' fees under Rule 1-341, the circuit court must wind its way through a two-step process.  First, the court must make a factual finding as to whether the challenged action was brought in bad faith or without substantial justification.  *Christian* [*v. Maternal-Fetal Medicine Assocs. of Md., LLC*, 459 Md. 1, 20–21 (2018)]. . . .

> Second, the court must, within its discretion, "separately find that the acts committed in bad faith or without substantial justification warrant the assessment of attorney's fees."  *Christian*, 459 Md. at 21.  Nonetheless, "even if the circuit court determines that a party has acted in bad faith or without substantial justification," it can "*decline to impose sanctions, in the exercise of its discretion.*"

256 Md. App. 369, 412–13 (2022) (some internal citations omitted).

against Appellants for misappropriation of trade secrets, however, appears to be the same conduct underlying the request for attorneys' fees, which was based on Appellants' allegedly "willful and malicious *misappropriation*[.]" CL § 11-1204(3) (emphasis added).

Ultimately, we cannot say we necessarily disagree with Cantwell-Cleary that the record *could* support a finding of willful and malicious action by the Appellants. We also readily concede that the trial court possessed broad discretion to change its position after reconsidering its initial reasoning on a motion to alter or amend. But the trial court must provide its reasoning for reversing its initial position on the record and in a manner that is internally consistent. As noted, CL § 11-1204 requires the trial court to first make a finding that "[w]illful and malicious misappropriation exists" before exercising its discretion to grant or deny an award of attorneys' fees. CL § 11-1204 (the court "*may* award reasonable attorney's fees to the prevailing party *if* . . . (3) [w]illful and malicious misappropriation exists") (emphasis added). We shall, therefore, vacate the April 13, 2022, order, and remand for the trial court to provide its reasoning for finding willful and malicious misappropriation on the record. In doing so, we note that the trial court, if it does find willful and malicious action, need not proceed to award to attorneys' fees to Cantwell-Cleary as the court's discretion to deny a fee award would then be acquired.

## CONCLUSION

In sum, we affirm the circuit court's rulings that Cantwell-Cleary was not precluded from seeking actual damages under its claims for misappropriation of trade secrets *and* that Appellants *had* misappropriated Cantwell-Cleary's trade secrets. However, we shall order a limited remand pursuant to Maryland Rule 8-604(d) because the circuit court erred in

78

awarding lost profits damages against Appellants based on Mr. Coleman's calculations which (1) utilized Cantwell-Cleary's past gross sales rather than the Appellants' actual gross sales as the base measure for calculating damages absent a cognizable explanation for doing so; (2) swept in losses from Appellants' former customers that did not follow them to Cleary Packaging; and (3) employed a damages period of three years without an explanation as to how Appellants continued to derive an economic advantage for that entire period. Accordingly, we shall vacate the damages portion of the circuit court's February 14 Judgment. On remand, the circuit court shall conduct further proceedings consistent with this opinion to re-calculate Cantwell-Cleary's damages under a new damages calculation consistent with CL § 11-1203 and this opinion for the claims for misappropriation of trade secrets. Following those proceedings, the court shall enter an order restating the money damages to be entered against Mr. Barstow and Mr. Ingram.

We also vacate the circuit court's April 13, 2022 Clarification Order pursuant to Maryland Rule 8-604(d), and order a limited remand for the court to address the ground for any finding of willful and malicious misappropriation under CL § 11-1204.

Because Appellants do not challenge the injunctions entered against them on appeal, we do not disturb those orders. In all other respects, the judgment of the circuit court is affirmed.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED IN PART AND VACATED IN PART. CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE SPLIT EVENLY.**

79